## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE COTY INC. SECURITIES LITIGATION | Master File No. 14 Civ. 0919 (RJS) **AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** **JURY TRIAL DEMANDED** |

Lead Plaintiffs Eugene Stricker and Michael Bollinger ("Plaintiffs"), by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, Lead Counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Coty Inc. ("Coty" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Coty; (c) review of other publicly available information concerning Coty, including transcripts of Coty's conference calls with investors, research analyst reports and media reports about the Company; and (d) information provided by confidential informants.

## I.     NATURE AND SUMMARY OF THE ACTION

1.     The claims asserted herein are strict liability and negligence claims under Sections 11 and 15 of the Securities Act of 1933 (15 U.S.C. §§ 77k and 77o) relating to Coty's June 13, 2013 initial public offering ("IPO") of approximately $1 billion in common stock. The claims are brought as a class action on behalf of persons and/or entities who purchased or otherwise acquired the common stock of Coty pursuant and/or traceable to the Company's registration statement filed with the SEC on Form S-1/A on May 28, 2013, (the "Registration Statement") and

prospectus filed with the SEC on Form 424(b)(4) on June 13, 2013 ("Prospectus"), in the Company's IPO of 57,142,857 million shares of common stock at a price of $17.50 per share.

2.     This action arises from Defendants' failure to disclose negative material facts and trends in the Registration Statement that were affecting Coty's financial condition at the time of the IPO.  As alleged in more detail below, during the months leading up to the IPO, sales of Coty's products were materially declining in the U.S. mass market across Coty's top customers, and across all Coty product segments – *Color Cosmetics*, *Fragrances*, and *Skin and Body Care.*

3.     Indeed, undisclosed to investors was the fact that Coty's U.S. and European customers, particularly U.S. mass retailers like Wal-Mart and Target, were "destocking" Coty products.  Destocking occurs when retailers adjust their inventory levels by declining to purchase new inventory, and, instead, sell the inventory at issue at a discount though promotional activities, such as sales and price reductions or returning products to Coty, rather than selling such products through to consumers.  Investors were not told that destocking in the U.S. mass market was occurring across most of Coty's top customers, and across all product segments, especially in Coty's *Color Cosmetics* segment, and *Sally Hansen* nail products.

4.     Further, by the time of the IPO, a material partnership between Coty and Sephora for the sale of Coty's *Sephora by OPI* nail polish had ended.  Sephora stopped purchasing *Sephora by OPI* and materially lowered the price of remaining inventory.

5.     As a result of the decline in consumption of Coty products, the loss of a material partnership with Sephora, and mass retailers destocking of Coty inventory, as of the time of the IPO, such mass retailers were not replenishing inventory of Coty products, or were stocking materially lower inventory of Coty products, a material negative trend that negatively affected the Company's *Color Cosmetics* segment's revenue, operating income and profit margins through the Company's fiscal quarter ended March 31, 2014.

6.    In violation of Section 11 of the Securities Act, none of these negative material facts and trends were disclosed in Coty's Registration Statement.

7.    As discussed in detail below (*see infra* Section VII), post-IPO disclosures corroborate that material negative facts and negative trends existed at the time of the IPO and were not disclosed in the Registration Statement.

## II.    JURISDICTION AND VENUE

8.    This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v).

9.    Venue is proper in this Judicial District pursuant to Section 22 of the Securities Act because the Company maintains its executive offices in New York, New York, and certain of the acts alleged in the complaint occurred in this Judicial District.

10.    In connection with the acts, transactions, and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mail, interstate telephone communications and the facilities of the national securities exchange.

## III.    PARTIES

11.    Lead Plaintiff Eugene Stricker purchased shares of Coty common stock pursuant to the Registration Statement issued in connection with the Company's IPO and has been damaged thereby, as set forth in the certification previously filed with the Court and incorporated by reference. (ECF No. 2, at 15).

12.    Lead Plaintiff Michael Bollinger purchased shares of Coty common stock pursuant to the Registration Statement issued in connection with the Company's IPO and has been damaged thereby, as set forth in the certification previously filed with the Court and incorporated by reference. (ECF No. 25-2, at 2-3).

13.     Defendant Coty is a Delaware corporation with its principal executive offices located at 350 Fifth Avenue, New York, New York 10118.  Coty has also maintained offices at 1 Park Avenue and 2 Park Avenue in Manhattan.

14.     Defendant Michele Scannavini ("Scannavini") was Chief Executive Officer ("CEO") and a director of Coty until September 30, 2014.  Scannavini signed or authorized the signing of the Company's Registration Statement filed with the SEC.

15.     Defendant Sérgio Pedreiro ("Pedreiro") was Chief Financial Officer ("CFO"), until he resigned in December 2013.  Pedreiro signed or authorized the signing of the Company's Registration Statement filed with the SEC.

16.     Defendant James E. Shiah ("Shiah") was, at all relevant times, Chief Accounting and Compliance Officer.  Shiah signed or authorized the signing of the Company's Registration Statement filed with the SEC.

17.     Defendant Lambertus J.H. Becht, ("Becht") was, at all relevant times, Chairman of the Board.  Becht signed or authorized the signing of the Company's Registration Statement filed with the SEC.  After Defendant Scannavini's departure from the Company, Defendant Becht was appointed interim CEO of the Company.

18.     Defendant Bradley M. Bloom ("Bloom") was, at all relevant times, a director of the Company. Bloom signed or authorized the signing of the Company's Registration Statement filed with the SEC.

19.     Defendant Joachim Faber ("Faber") was, at all relevant times, a director of the Company. Faber signed or authorized the signing of the Company's Registration Statement filed with the SEC.

20.    Defendant Oliver Goudet ("Goudet") was, at all relevant times, a director of the Company. Goudet signed or authorized the signing of the Company's Registration Statement filed with the SEC.

21.    Defendant Peer Harf ("Harf") was, at all relevant times, a director of the Company. Harf signed or authorized the signing of the Company's Registration Statement filed with the SEC.

22.    Defendant M. Steven Langman ("Langman") was, at all relevant times a director of the Company. Langman signed or authorized the signing of the Company's Registration Statement filed with the SEC.

23.    Defendant Erhard Schoewel ("Schoewel") was, at all relevant times, a director of the Company. Schoewel signed or authorized the signing of the Company's Registration Statement filed with the SEC.

24.    Defendant Robert Singer ("Singer") was, at all relevant times, a director of the Company. Singer signed or authorized the signing of the Company's Registration Statement filed with the SEC.

25.    Defendant Jack Stahl ("Stahl") was, at all relevant times, a director of the Company. Stahl signed or authorized the signing of the Company's Registration Statement filed with the SEC.

26.    The Defendants listed in ¶¶ 14-25 are collectively referred to hereinafter as the "Individual Defendants."

27.    Coty and the Individual Defendants are collectively referred to as the "Defendants."

## IV.    CLASS ACTION ALLEGATIONS

28.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a Class, consisting of all persons and/or entities who purchased or

otherwise acquired the common stock of Coty (CUSIP: 222070203) pursuant and/or traceable to the Company's false and misleading Registration Statement issued in connection with the Company's IPO, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, controlling shareholders, and any entity in which Defendants have or had a controlling interest.

29.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds of members in the proposed Class, as the Company offered over 57 million shares of common stock in the IPO. Record owners and other members of the Class may be identified from records maintained by Coty or its transfer agent.

30.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

31.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

32.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: (a) whether Registration Statement contained untrue statements of material facts and/or omitted to state material facts required to be stated in the Registration Statement or necessary to make the statements in the Registration Statement not misleading; and (b) to what extent the members of the Class have sustained damages and the proper measure of damages.

33.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## V.     BACKGROUND

### A.     Coty Conducts its Business through Three Segments

34.     According to the Registration Statement, Coty is a pure play beauty company with a portfolio of brands that competes in the three segments: *Fragrances, Color Cosmetics* and *Skin & Body Care*.

35.     According to the Registration Statement, for fiscal 2012 (ended June 30, 2012), *Fragrances, Color Cosmetics* and *Skin & Body Care*, respectively reported net revenues 53%, 31% and 16% of Coty's reported net revenues.

36.     Further, according to the Registration Statement, Coty sells certain products through multiple distribution channels:

> We sell products in each of our segments through retailers, including hypermarkets, supermarkets, independent and chain drug stores and pharmacies, upscale perfumeries, upscale and mid-tier department stores, nail salons, specialty retailers, duty-free shops and traditional food, drug and mass retailers.

> Our principal retailers in the mass distribution channel include CVS, Kmart, Target, Walgreens and Wal-Mart in the United States and Boots, DM, Carrefour and Watson's in Europe. Our principal retailers in the prestige distribution channel include Macy's, Neiman Marcus, Nordstrom and Saks Fifth Avenue in the United States, AS Watson and Douglas in Europe and Sephora in multiple geographic regions.

> In fiscal 2012, no retailer accounted for more than 10% of our global net revenues; however, certain retailers accounted for more than 10% of net revenues within certain geographic markets. In fiscal 2012, our top ten retailers combined accounted for 29% of our net revenues and Wal-Mart, our top retailer, accounted for 7% of our net revenues.

37.     According to Coty's Registration Statement, the Company has several "power brands", which are described as its largest brands and those that it believes to have the greatest global potential.  The Registration Statement further stated "[w]e have grown our power brands from three brands in fiscal 2002 to 10 brands in fiscal 2012, with the net revenue contribution from these brands increasing from 40% of $1.4 billion to approximately 70% of $4.6 billion during the same time period." (alteration added).

38.     According to the Registration Statement, one such power brand is *Sally Hansen*:

> We have owned the *Sally Hansen* brand since acquiring Del Laboratories in fiscal 2008. *Sally Hansen* is the #1 nail care product brand in North America. We believe that *Sally Hansen* has the most diversified and successful line of nail products in the U.S.

> Products in our *Sally Hansen* line include nail care products, nail color lacquers and nail and beauty implements. We also sell lip products, eye tools and a broad range of lotions, depilatory and wax products through our *Sally Hansen* brand. *Sally Hansen* is sold in drugstores and other mass retailers. Although *Sally Hansen* is currently primarily a North American brand, we have begun successfully expanding its presence in Europe, Asia and South America by focusing on nail care and color.

39.     According to the Registration Statement another power brand is *OPI*:

> We have owned the *OPI* brand since acquiring OPI in fiscal 2011. Founded in 1981, OPI is the leader in professional nail care. With its portfolio of over 400 creatively named unique shades, OPI links fashion and entertainment with color cosmetics. OPI regularly creates limited-edition collections with celebrities and entertainment franchises and works with fashion houses and fashion publications to promote the brand. Our *OPI* brand product lines include *OPI* (which is sold through salons, travel retail and traditional retailers) and *Nicole by OPI* (which is sold through mass retailers). OPI also markets nail gels, nail care products and nail accessories through salons. *OPI* is sold in over 100 countries and territories.

**B.     Confidential Informants**

40.     Confidential Informant 1 ("CI 1") was a Vice President of Field Sales for Coty from June 2009 through February 2013.  CI 1 was an account manager for cosmetic and fragrance products to retail customers including: Rite Aid, Sears, Kohl's Military Meijer, Value Channel and

Food COT.

41.     Confidential Informant 2 ("CI 2") was a Director-Demand Planning, Supply Chain, and Sales and Operations Planning.  CI 2 was employed with Coty from December 1999 through October 2013.  While at Coty CI 2 was responsible for managing the supply chain unit of the Company and was involved in sales forecasting, inventory production, asset allocation, risk and opportunity assessment, and long term capital planning for the Company's fragrance unit. Between approximately 2009 and 2013, CI 2 was responsible for reducing obsolete inventory as well as creating the Sales and Operations Planning process.

42.     Confidential Informant 3 ("CI 3") was a Senior Marketing Manager, Brand Management for Coty, Inc. from January 2007 through October 2013.  CI 3 worked within the color cosmetics marketing department for mass market customers such as Wal-Mart, Target, Walgreens, and CVS and was partially responsible for product launches, developing branding strategies, and observing the effects of competitor products (*i.e.* Loreal, Revlon) on Coty sales.

43.     Confidential Informant 4 ("CI 4") was a Demand Analyst for Coty from January 2013 through April 2013.  CI 4 was responsible for analyzing, changing, and applying forecast data using the Company's forecasting programs: Futurion, Manguistics and SAP.  CI 4 was focused on the product lines for *Rimmel* Cosmetics, *New York Color* and *Sally Hansen* offerings to retail customers like Target, Wal-Mart and Walgreens.  CI 4 attended bi-weekly meetings along with Coty sales and purchasing personnel where customers' orders and forecasts were discussed.

44.     Confidential Informant 5 ("CI 5") was a Customer Forecasting Analyst for Coty from July 2010 through May 2013.  CI 5 was a one of four analysts within Coty's Forecasting Divisions for all of the Company's mass retail customers (*i.e.* Wal-Mart, Target, etc.), and was responsible for analyzing market trends and sales patterns utilizing Manguistics software to create forecasts based on historic sales patterns.

45.     CI 6 was a retail manager for Coty from 2007 through December 2013.  CI 6 was responsible for training store team members for specialty customers such as Macys, Sephora, and Neiman Marcus on new brand launches and managed product sell-through (*i.e.* the sale of Coty products from retailers to consumers) in 24 stores.

46.     CI 7 was a Corporate Travel Consultant for OPI Products/Coty Inc. from February 2012 through April 2013.  CI 7 was responsible for arranging business travel itineraries for OPI's senior executives.

**C.     Coty Management Uses Technology to Monitor Sell-Through Rates and Inventory**

47.     Coty management used a variety of technological tools to monitor the level of inventory at its retail partners.  Mass market customers, such as Wal-Mart, provide Coty with daily "Dashboards" which provide statistics on each Stock Keeping Unit ("SKU") maintained in a retailer's inventory.

48.     Information Resources, Inc. ("IRI") was subcontracted by Coty to provide Coty management with specific sales data points including, current and previous unit forecasts, gross sales, sell-through rates (*i.e.*, rates at which products are purchased by consumers from retailers), and point of sale data (*i.e.*, what is happening at the register) for each Coty SKU in circulation. These reports were created and circulated electronically within the Company.  Coty's Prestige division utilized The NPD Group ("NPD") to provide similar data monitoring and analytical services.

49.     Both IRI and NPD provided Coty management with data on the amount of inventory a retailer possessed as well as the sell-through rate of each of Coty's products.

50.     Using these inventory management systems, Coty management was able to observe the amount of inventory held by retailers in a near real-time fashion.

**D.      Coty Management Monitored Sell-Through and Inventory Reports.**

51.      According to Confidential Informants 1-3, Coty's business segments held monthly Sales and Operations Planning meetings (called "S&OP" meetings) at which unit forecasts and sales for every Coty product line were discussed with division and executive leadership, including George Cleary, President of Coty Beauty Americas.

52.      Coty employed "demand planners" who were responsible for sales forecasts and analyzing the effectiveness of inventory at meeting customer demand, point-of-sale data, the percent of retail locations with particular Coty items on hand, and other data provided to Coty by its retail partners.  Coty's demand planners would also monitor Excess & Obsolete ("E&O") inventory.

53.      Further, Coty's demand planners would collaborate with Coty's Collaborative Planning, Forecasting and Replenishment ("CPFR") team.   According to the *Voluntary Interindustry Commerce Standards Association*, CPFR is a business practice concerning the planning and fulfillment of customer demand.  Coty's CPFR team aimed to enhance the flow of goods from Coty to retailers and eventually customers by supporting and assisting joint practices with retailers. CPFR sought cooperation with retailers in the management of inventory through joint visibility and replenishment of products throughout the supply chain. As a result, information was shared between Coty and retailers to aid planning and ensuring that customer demand was met. Because of this, Coty had continuous updates on inventory and upcoming requirements.

54.      According to Confidential Informants 4-5, SAP and Manugistics are makers of accounting and supply chain management software that Coty has used to monitor and analyze inventory.

55.      According to Frank Fiore's ("Fiore") *LinkedIn* profile, he was a demand planner at Coty between July 2008 and July 2012, and has been a senior demand planner since July 2012.

As a demand planner he would collaborate monthly with CPFR teams to analyze POS, in-stock percentages and other data provided by Coty's retail partners to ensure best-in-class forecast accuracy and customer service.   Fiore also built and managed a SKU level forecast for the *New York Color*, *Sally Hansen* Beauty Tools and *Nicole by OPI* brands while providing best-in-class forecast accuracy.

56.     In addition, Fiore would participate in the monthly S&OP process to ensure the demand plan, sales plan and financial plan are aligned; conduct monthly forecast consensus meetings with Marketing and Operations teams; and collaborate weekly with a cross-functional team to analyze fill rates, root cause services issues and execute solutions.

57.     Thus, Coty's inventory management technology and reporting structure allowed it to forecast sales trends several months prior to their public announcement.  In addition, within five months after a product launch, Coty could forecast that product's future sales.

**E.     Sales of Coty's Products Materially Decline before the IPO.**

58.     In the months leading up to the IPO, U.S. mass retailers were "destocking" Coty inventory across most of Coty's top customers, and across all product segments.  Destocking occurs when a retailer adjusts its inventory levels by declining to purchase new inventory, and instead sells such inventory at a discount though promotional activities such as sales and price reductions, or returns products to Coty, rather than selling through such products to consumers.

59.     According to CI 2, if, for example, Wal-Mart would normally maintain 8 weeks of Coty inventory on hand, in a destocking, it would inform Coty that it intends to reduce its inventory on hand to 7 weeks.  In this example, purchase of Coty inventory would effectively be paused for one week, after which the process of stocking resumes.

60.     According to CI 2, destocking that occurs over several quarters and across several customers indicates a negative trend that consumer demand for products has materially declined

or that the product is no longer being sold to consumers. According to CI 1, starting in approximately late 2012, sales of Coty's Color Cosmetics were struggling due to increased competition and lack of customer demand for Coty's products. According to CI 3, between 2010 and 2012, *Sally Hansen* nail products were very popular and experienced double-digit sales growth. However, towards the end of 2012 and throughout 2013, there was a significant increase in competitor products, which negatively affected customer demand for *Sally Hansen* products.

61.    In other words, for more than six months prior to the IPO, Coty's competitors increased the number of products that directly competed with the *Sally Hansen* line, which negatively affected sales of Coty products.

62.    During this timeframe, customers were losing interest in Coty products. CI 4 confirmed that *Sally Hansen* underperformed in the months leading up to the IPO, stating that customer orders for *Sally Hanson* products were smaller than expected during the term of CI 4's employment from January to April 2013.

63.    During the spring of 2013, CI 6 witnessed a slow-down in mass market sales of certain cosmetic products.

64.    Coty was well aware, by the beginning of 2013, that the *Sally Hansen* nail gel line was selling poorly and forecasted that nail gel sales would fall, due in part to their ability to predict product performance within five months after launch.

65.    CI 2 learned, with respect to the nail gel launch in October/November 2012, that sales results were not what was expected. According to CI 2, by January/February 2013, *Sally Hansen* nail gels were forecasted to be down.

66.    In approximately May/June 2013, CI 2 observed de-stocking activity whereby Coty's cosmetics were being returned or destroyed.

67.    Coty also faced competition from its retail customers for several months before the

13

IPO.  According to CI 3, starting in early 2013, customers such as Walgreens and Wal-Mart began replacing *Sally Hansen* product with their own respective labels, such as *Sinful* and *SensatioNail*.  According to CI 3, most mass retailer customers were no longer interested in the *Sally Hansen* private label or the "Nail Gel" Category.  According to CI 3, customers were losing interest in Coty.

68.     These material negative trends were discussed within the Company at senior levels.

69.     CI 3 attended monthly S&OP meetings at the Company's prior New York City headquarters on 1 Park Ave, which were led by George Cleary, President of Coty Beauty Americas, and attended by marketing, sales and logistics leadership.  Upon information and belief, David Russell, current VP of color cosmetics and Matt Lucas, former SVP, Sales for Coty Beauty, attended those meetings.  During monthly S&OP meetings attended by CI 3, in the months leading up to Coty's June 2013 IPO, declining sales trends, customer disinterest, and competitor risks were discussed.

70.     According to CI 3, during Coty's 2013 fiscal year, the Company's financial performance was heavily relying on Coty's nail gel launches that CI 3 observed were not performing due to lack of customer demand.

71.     In other words, Coty's financial performance in the six months prior to the IPO depended on a strong nail gel launch, and instead Coty had a lackluster launch.

72.     While Coty attempted to develop contingency plans to counter declining sales trends, by the time of the IPO, their efforts had failed.  According to CI 3, in the months leading up to Coty's IPO in June 2013, CI 3 worked on numerous marketing plans which included developing certain "action plans" to counter declining sales trends, but in the months before the June 2013 IPO, there was no real contingency plan to counter the downward sales trends.

73.     By the time of the IPO, OPI had stopped manufacturing and shipping *Sephora by*

OPI products to Sephora store locations, and Coty had materially discounted *Sephora by OPI* products, which reduced and would continue to reduce the profit margin for sales of *Sephora by OPI*.   In November 2012, CI 7 learned from Sue Freedman, Supervisor of the Corporate Travel Department at OPI, that OPI was no longer going to be manufacturing or marketing the *Sephora by OPI* line of nail products.   In or around November 2012, CI 7 attended a warehouse sale at which huge amounts of *Sephora by OPI* product were severely discounted to OPI employees. Before the IPO *Sephora by OPI* products were being sold at a discount of up to 50% by Coty's retail customers.

74.     By the time of the IPO, Coty had failed to counter the negative trends in the *Color Cosmetics* segment.

## VI.   COTY'S REGISTRATION STATEMENT CONTAINED MATERIAL UNTRUE STATEMENTS AND OMITTED MATERIAL INFORMATION.

75.     The Registration Statement contained untrue statements of material facts and omitted to state material facts necessary to make the statements made not misleading, and was therefore not prepared in accordance with the applicable SEC rules and regulations governing its preparation.

76.     Item 303(a) of SEC Regulation S-K required the Registration Statement to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."   17 C.F.R. § 229.303. In addition to the identification of such trends or uncertainties, Item 303 requires disclosure of (i) whether those trends or uncertainties have had or are reasonably expected to have a material unfavorable impact on revenue; and (ii) the extent of any such impact on revenue.   Item 303 also requires disclosure of "events that will cause a material change in the

relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments)." *Id.*

77.    Moreover, pursuant to SEC Regulation C, Defendants had a duty to disclose material information necessary to ensure that representations in the Registration Statement were not misleading. Specifically, Rule 408 states that, "[i]n addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading." 17 C.F.R. § 230.408(a).

78.    Coty's Registration Statement failed to disclose the following material facts required to be stated in the Registration Statement:

a)    During the months leading up to the IPO, sales of Coty's products were materially declining in the U.S. mass market across Coty's top customers, and across all Coty product segments – *Color Cosmetics*, *Fragrances*, and *Skin and Body Care.*  During the quarter leading up to the IPO, Coty's U.S. and European customers, particularly U.S. mass retailers like Wal-Mart and Target, were "destocking".  Destocking in the U.S. mass markets was occurring across most of Coty's top customers, and across all product segments, especially in Coty's *Color Cosmetics* segment and *Sally Hansen* nail products;

b)    In the months leading up to the IPO, Coty's sales growth of nail products, such as *Sally Hansen*, was materially declining.  By the time of the IPO, sales of Coty's nail products had materially declined and were flat, and in July 2013, sales were negative in July 2013, compared to July 2012. In fact, in the months leading up to the IPO, retailers such as Walgreens and Wal-Mart began replacing *Sally Hansen* product with their own respective house labels, *Sinful* and *SensatioNail.*  This material trend negatively

affected the Company's *Color Cosmetics* segment's operating income and margins through the Company's fiscal quarter ended March 31, 2014, as set forth in the chart below;

c) By the time of the IPO, a material partnership between Coty and Sephora for the sale of Coty's *Sephora by OPI* nail polish had ended.  By the time of the IPO, Sephora stopped purchasing *Sephora by OPI* and materially lowered the price of remaining inventory in anticipation of Sephora's expansion of its *Sephora X* line of nail products;

d) As a result of the decline in consumption of Coty products, the loss of a material partnership with Sephora, and mass retailers destocking of Coty inventory, such mass retailers were not replenishing inventory, or were stocking materially lower inventory of Coty products, a material negative trend that would cause a material decline in Coty's revenue of approximately $35 million in July through September 2013 (*see infra* Paragraph 104), representing a loss of approximately 9% of the *Color Cosmetics* revenue for Coty's fiscal quarter ended September 30, 2013 (Coty reported net revenues of $385.1 million for the fiscal quarter ended September 30, 2013); and

e) In addition, destocking was a material trend that negatively affected the Company's *Color Cosmetics* segment's revenue, operating income and profit margins through the Company's fiscal quarter ended March 31, 2014 (*see e.g. infra* Paragraphs 101, 106, 114, 117, 120) as follows:

        **i.**    *Color Cosmetics Reported Operating Income by Quarter*

| Q2 2013 ended 12/31/12 | Q3 2013 ended 3/31/13 | Q4 2013 ended 6/30/13 | Q1 2014 ended 9/30/13 | Q2 2014 ended 12/31/13 | Q3 2014 ended 3/31/14 |
|---|---|---|---|---|---|
| $57.1 million | $50.4 million | $28.1 million | $36.8 million | $33.7 million | $36.7 million |

ii.   *Color Cosmetics Reported Operating Margins (operating income as a percentage of net revenues) by Quarter*

| Q2 2013 ended 12/31/13 | Q3 2013 ended 3/31/13 | Q4 2013 ended 6/30/13 | Q1 2014 ended 9/30/13 | Q2 2014 ended 12/31/13 | Q3 2014 ended 3/31/14 |
|---|---|---|---|---|---|
| 15.4% | 13.7% | 7.3% | 11.8% | 10.1% | 10.6% |

79.   In addition to the Registration Statement's failure to disclose the material facts delineated above in Paragraph 78, the Registration Statement contained untrue and misleading representations as set forth in Paragraphs 80-98.

80.   In the *Management's Discussion and Analysis of Financial Condition* ("MD&A") section of the Registration Statement, the Registration Statement represented the following regarding the *Color Cosmetics* segment's net revenue for the nine months ended March 31, 2013:

> In the nine months ended March 31, 2013, **net revenues of Color Cosmetics** increased 4%, or $39.1 [million], to $1,083,4[000] from $1,044[3000] in the nine months ended March 31, 2012 . . . . **net revenues of Color Cosmetics increased 5%, primarily driven by strong growth in Rimmel and Sally Hansen** . . . .The Sally Hansen brand also benefitted from its introduction into the German market along with strong net revenues growth in Mexico and Argentina primarily driven by new launches **and expanded distribution. Higher net revenues in** N.Y.C. New York Color and **OPI also contributed to growth in the Color Cosmetics segment** . . . **Increased net revenues in OPI primarily reflect expanded distribution** in Europe and in our travel retail businesses in all three geographic regions, partially offset by lower net revenues of OPI Shatter and OPI GelColor, which generated strong net revenues in the nine months ended March 31, 2012 as new launches . . . **The positive price and mix impact for the segment was primarily driven by the growth of higher than segment average priced Sally Hansen and *OPI* products.**

Registration Statement at 51 (emphasis added).

81.   The representation that Coty's *Color Cosmetics*' segment's net revenues had grown through March 31, 2013 was an untrue statement and was misleading because, as set forth above in Paragraph 78(a)–(e)(i), Coty's *Color Cosmetics* segment's net revenues were materially declining by the time of the IPO.

82.   The representation that Coty's *Color Cosmetics* segment's net revenues "increased

5%, primarily driven by strong growth in . . . Sally Hansen . . ." was an untrue statement and was

misleading because, as set forth in in Paragraph 78(a)-(e), *Sally Hansen* products were being

destocked by mass retailers and *Sally Hansen* revenues were materially declining by the time of

the IPO.

83.     The representation that "[t]he positive price and mix impact for the segment was

primarily driven by the growth of higher than segment average priced *Sally Hansen* and *OPI*

products" was an untrue statement and was misleading because, as set forth above in Paragraphs

58-74, *Sally Hansen and OPI* were being destocked by the time of the IPO.

84.     In the MD&A, the Registration Statement represented the following concerning the

*Color Cosmetics* segment's operating income:

> In the nine months ended March 31, 2013, **operating income for Color Cosmetics
> increased 6%**, or $10.7, to $180.7 from $170.0 in the nine months ended March
> 31, 2012. The increase in operating income reflects higher net revenues and
> improved operating margin.  Operating margin increased to 16.7% of net revenues
> in the nine months ended March 31, 2013 as compared to 16.3% in the nine months
> ended March 31, 2012, primarily driven by lower selling, general and
> administrative expenses as a percentage of net revenues, partially offset by higher
> cost of sales as a percentage of net revenues.

> Registration Statement at 55 (emphasis added).

85.     The representation that Coty's *Color Cosmetics* segment's operating income had

increased through March 31, 2013 was an untrue statement and was misleading because, as set

forth above in Paragraph 78(a)-(e), *Color Cosmetics'* operating income was materially declining

by the time of the IPO.

86.     In the MD&A, the Registration Statement represented the following regarding the

Company's Net Revenues by Geographic Regions:

> In the nine months ended March 31, 2013, net revenues in the Americas increased
> 3%, or $41.1, to $1,485.1 from $1,444.0 in the nine months ended March 31, 2012
> . . . The increase in net revenues reflects growth in virtually all countries in the
> region, with the largest increase in our U.S. operating subsidiary, **primarily**

**reflecting strong growth** in the Fragrances and **Color Cosmetics segments** . . . **The increase in Color Cosmetics in the U.S. is primarily due to growth in** *Rimmel,* **Sally Hansen** . . . .

Registration Statement at 52 (emphasis added).

87.     The representations that net revenues in the U.S. were growing due to growth in *Sally Hansen* were not true and were misleading because, as set forth above in Paragraph 78(a)-(e), *Sally Hansen* products were being destocked by U.S. retailers and sales of *Sally Hansen* products were materially declining at the time of the IPO.

88.     In the MD&A, the Registration Statement represented the following regarding the Company's *OPI* brand:

> **we are expanding** the *OPI* brand globally primarily through the professional channel where the brand enjoys strong leadership. We also are offering *OPI* through selective distribution channels as well as our growing travel retail business and offering *Nicole* by *OPI* through our mass distribution channels. We have also recently appointed Sephora as privileged retail partner for OPI in certain European and Middle Eastern countries and Russia. The development of branding and market execution strategies with our top global customers is an important component of our strategy to ensure our brands receive appropriate pricing and placement **as we expand our distribution.**

Registration Statement at 106 (emphasis added).

89.     The representation that *OPI* "was expanding" and that Coty was ensuring that OPI was receiving "appropriate pricing and placement as we expand" was untrue and misleading because the Registration Statement failed to disclose that, by the time of the IPO, OPI sales had contracted in material part because a partnership between Coty and Sephora for the sale of Coty's *Sephora by OPI* nail polish had ended.  Indeed, by the time of the IPO, Sephora stopped purchasing *Sephora by OPI* and materially lowered the price of remaining inventory in anticipation of Sephora's expansion of its *Sephora X* line of nail products.

90.     Further, this was an undisclosed negative trend that adversely affected Coty's financial results before the IPO through Coty's second fiscal quarter (ended December 31, 2013)

(*see e.g., infra* Paragraphs 110, 112).

91.     The Registration Statement contained the following purported "risk disclosure"

concerning competition:

> The beauty business is highly competitive, and **if** we are unable to compete
> effectively our results will suffer. . . .
>
> It is difficult for us to predict the timing and scale of our competitors' actions in
> these areas or whether new competitors will emerge in the beauty business,
> including competitors who offer comparable products at more attractive prices. . . .
>
> Our ability to compete also depends on the continued strength of our products, both
> power brands and other brands, including our continued leadership in fragrances,
> growth and innovation in color cosmetics . . . . **If** we are unable to continue to
> compete effectively on a global basis, it **could** have an adverse impact on our
> business, results of operations and financial condition.
>
> Registration Statement at 20 (emphasis added).

92.     The representations in Paragraph 91 were untrue and misleading because the

Registration Statement purported to warn investors only that competition "***could*** have an adverse

impact on our business, results of operations and financial condition" (emphasis added) when, as

set forth above in Paragraphs 58-74, and 78, at the time of the IPO, Coty's competition already

had a material adverse impact on *Sally Hansen* and *OPI*, and U.S. mass retailers were destocking

Coty products across all segments.

93.     The risk warning delineated in Paragraph 91 was untrue and misleading for the

additional reason that it represented that Coty's *Color Cosmetics* segment was growing, when in

fact, at the time of the IPO, sales of Coty's *Sally Hansen* and *OPI* brands had materially declined,

as set forth above in Paragraph 78.

94.     The risk warning delineated in Paragraph 91 that "[i]t is difficult for us to predict

the timing and scale of our competitors' actions in these areas or whether new competitors will

emerge in the beauty business, including competitors who offer comparable products at more

attractive prices" was untrue and misleading because as set forth above in Paragraphs 58-74 and 78, Coty's competitors actions had already negatively affected the Company's financial results.

95.     The Registration Statement contained the following purported "risk disclosure" concerning market trends:

> Rapid changes in market trends and consumer preferences **could** adversely affect our financial results . . . Net revenues and margins on beauty products tend to decline as they advance in their life cycles, so our net revenues and margins **could** suffer if we do not successfully and continuously develop new products. . . . If we are unable to anticipate and respond to trends in the market for beauty and related products and changing consumer demands, our financial results **may** suffer.

> Registration Statement at 20-21 (emphasis added).

96.     The representations in Paragraph 95 were untrue and misleading because Coty purported to warn investors only that market trends ***may*** have an adverse impact on the Company's business, results of operations and financial condition" when, as set forth above in Paragraph's 58-74 and 78, at the time of the IPO, negative market trends already had a material adverse impact on sales of *Sally Hansen* and *OPI*.

97.     The Registration Statement contained the following purported "risk disclosure" concerning inventory:

> **If** we misjudge consumer preferences or demands or future sales do not reach forecasted levels, **we could** have excess inventory that we **may** need to hold for a long period of time, write down, sell at prices lower than expected or discard. If we are not successful in managing our inventory, our business, financial condition and results of operations **could** be adversely affected.

> Registration Statement at 33 (emphasis added).

98.     The representations in Paragraph 97 were untrue and misleading because Coty purported to warn investors only that excess inventory ***could*** have an adverse impact on the Company's business, results of operations and financial condition" when, as set forth in Paragraphs 58-74 and 78, at the time of the IPO, U.S. mass retailers were destocking inventory across all Coty

products in each of Coty's product segments (in particular Coty's *Sally Hansen* products), and

Coty's partnership with Sephora for sale of *Sephora by OPI* had ended and Coty had a material

amount of excess inventory that it materially discounted.

## VII.   POST-IPO DISCLOSURES CORROBORATE THAT MATERIAL NEGATIVE TRENDS AND FACTS WERE NOT DISCLOSED IN THE REGISTRATION STATEMENT

99.   On August 8, 2013, Piper Jaffray published a research report concerning Coty that

stated, in part, the following:

> we are raising awareness around Coty's potential exposure to destocking issues at
> a large retailer causing disruption to [Elizabeth Arden Inc.]'s revenue stream –
> presumably Wal-Mart. That said, we continue to see strength in the prestige
> fragrance market and in the EMEA region what with significantly better sales
> trends being recently reported from peer Inter Parfums (IPAR). We believe Coty is
> a best-in-class innovator and brand steward with a financial roadmap calling for at
> least +LSD% revenue and +HSD% net income growth amidst a favorable backdrop
> for the fragrance and beauty industry. . . . We are not changing estimates at this
> time . . . .

(alteration added).

100.   On August 8, 2013, Coty shares declined from a closing price on August 7, 2013,

of $17.28 per share, to close at $16.81 per share on August 8, 2013, a decline of $0.47 per share

or approximately 3% on heavier than normal volume.

101.   On September 17, 2013, before the market opened, Coty filed a report with the SEC

on Form 8-K that contained a press release in which Coty announced its financial results for the

fourth quarter and fiscal year ended June 30, 2013.  The September 17, 2013 press release stated,

among other things, the following:

**Outlook for Fiscal 2014 First Quarter and Full Year**

> Over the last few months the Company has seen a deceleration of market growth in
> the U.S. and Europe, triggering significant trade de-stocking activity, particularly
> by U.S. mass retailers. As a consequence, Coty estimates net revenues in the first
> quarter of fiscal 2014 [July 1 2013 through September 30, 2013] to marginally
> decline versus the prior year period.

(alteration added).

102.    Also on September 17, 2013, the Company conducted a conference call with investors to discuss the Company's financial results for the fourth quarter and fiscal year ended June 30, 2013.  On the conference call, Defendant Scannavini stated, among other things, the following:

> Sally Hansen, after a strong start in the year, had more challenges in the second half, ending stable for the year overall. The nail category has seen unprecedented competitive activity, with several new brands joined in the arena, and investment increasing significantly. At the same time, consumption growth is slowing down, resulting in the [de]stocking activity by retailers **which impacted Sally Hansen in the fourth quarter of fiscal-year '13 and the first quarter of fiscal-year '14**. . . .
>
> ***
>
> Looking at the beginning of fiscal-year 2014, we have seen a deceleration on market growth over the last few months in the US and Europe, triggering significant destocking activity, particularly by US mass retailers. **Inventory reduction in the US mass markets is occurring across most of our top customers, and across all product segments. As a consequence, we estimate net revenues in the first quarter of fiscal-year 2014 to be marginally lower than last year.**
>
> ***
>
> Let me say that what we are seeing now is clearly a trend on the market that shows slower development in mass versus prestige. This is true in the US, and this is also true in Europe.
>
> (emphasis added).

103.    On the September 17, 2013 conference call, Defendant Pedreiro stated, among other things, the following:

> As we enter fiscal 2014, [starting on July 1, 2013] we are facing the impact of trade destocking in the US, and increasing promotional activity in Europe. As Michele [Scannavini] explained, these recent market developments are impacting our mass business and total net revenues for the first quarter of fiscal '14 [ended September 30, 2013]
>
> (alterations added).

104.    Also on the September 17, 2013 conference call, the following colloquies occurred

between stock analysts and Defendants Pedreiro and Scannavini:

**Olivia Tong** - BofA Merrill Lynch - Analyst

[C]an you parse out how much of the deceleration that you see in Q1 [ended September 30, 2013] -- how much of that is destocking versus the underlying category deceleration in the US and Europe?

**Michele Scannavini** - Coty Inc. - CEO
Those two are phenomena that is a bit difficult to separate one from the other. Now, obviously, everything starts with the deceleration of the market growth. When we talk of US, for instance, that is where we see the most important destocking activity. We have clearly seen a deceleration of the market growth in the three categories where we compete -- fragrance prestige, fragrance mass, and color, particularly in the nail segment. **This happened in the last quarter of last year, and in the first couple of months of this year**.

Now, this is the trigger event for the trade to readjust the stock level on the consumption level and growth. So, I must say that when we look at the first two months of our quarter, **that the destocking has impacted quite significantly. We calculate, in the first two months, a destocking impact of around $23 million to $25 million on our net revenues in the US. Clearly, progressively we expect the [selling] to get more in line with the consumption.**

                                        ***
**Bill Schmitz** - Deutsche Bank - Analyst

Can you just talk about, first, the margin trends in the quarter, both gross and operating margin -- or SG&A ratio rather -- because the 230-basis-points decline in gross margin -- what drove that? And what the outlook is going forward? And then, it looks like SG&A came down significantly in the quarter -- down over 500 basis points year over year. Maybe some of the drivers there, and how sustainable some of those reductions are? And I have a follow-up, please.

**Sergio Pedreiro** - Coty Inc. - CFO

Hi, Bill. You're right. The gross margin came down 230 basis points. This was a combination of two factors. There is about 50 basis points that is a fiscal-year '12 reclassification of an expense that was actually catching up for the full year. So, it's amounted for 50 basis points for that quarter, but was actually adjusting for the full year. **The balance of 180 basis points was the impact of higher discounting allowances, as we discussed . . . .**

**Joe Lachky** - Wells Fargo Securities - Analyst

In the US mass channel, is the destocking concentrated at the biggest retailer, or has the trend spread to other US mass retailers?

**Michele Scannavini** - Coty Inc. - CEO
**It is concentrated on the top retailers. This is where we see the most important destocking activity. It is also what is impacting more our Business in the first quarter.**

**Joe Lachky** - Wells Fargo Securities – Analyst

Okay. And then the follow-up -- it sounds like you are expecting trade inventory to normalize at some point in fiscal-year 2014. I just want to clarify that. Are you expecting -- are you baking into your estimates some sort of a restocking boost, or is it essentially just an adjustment where sell-in meets sell-through? And when do you expect that to occur? I guess you're not expecting it in the first quarter. And what gives you confidence that that essentially restocking will materialize?

**Michele Scannavini** - Coty Inc. - CEO
Obviously, everything depends on the consumption development. So, at the moment, what's happening is that the retailer [sic] are readjusting their inventory to a lower consumption than expected. So, as such, unless the consumption pick up faster, there's going to be an adjustment on the low side. **We are not anticipating any restocking.**

*\*\*\**

**John Bolger** - JPMorgan - Analyst
This flows into the last question. In terms of thinking about the sequential improvement from Q1 where you're guiding to down to the back half, where you're guiding to more in line with the long-term algorithm, how should we think about that improvement? Are there underlying factors where, even if the destocking continues, that you can expect some sort of sequential improvement from Q1 to Q2?

And this seems fairly obvious, but you only have a couple weeks left in Q1. I would assume you're feeling pretty comfortable in terms of the Q1 guidance, and there doesn't seem to be much that could cause any consternation from that standpoint there. Is that the case? Thank you.

**Michele Scannavini** - Coty Inc. - CEO
First part of your question -- what makes us confident to progressively recover a better growth rate. First of all, as I said before, with the visibility we have today, we estimate there is destocking, at least in the most important part of it should be over by this first half. **But apart from this, and even though the destocking will be more severe than we anticipate, it will go longer than we anticipate, clearly we expect some impact on our growth by all the activity that we are doing to accelerate our development in emerging markets. . . .**

**Neely Tamminga** - Piper Jaffray - Analyst

Just two related questions. Michele, could you give us a little bit more of a contextualization of the destocking issue in terms of sell-in versus sell-through? What the delta is there between those two different line items would be helpful to help contextualize this issue.

**Michele Scannavini** - Coty Inc. - CEO

Okay. So, coming back to the destocking phenomenon -- as I said before, we have calculated the impact on our revenues of the destocking in the first two months of quarter one, to be around $23 million to $25 million. **And this is impacting particularly our color and nail business. So, the brand that will be more impacted by this is Sally Hansen.**

And on this I can maybe help to understand what's going on, mentioning a couple of market data that I think is very telling. When we talk of the nail category, as you know, the nail category had a fantastic growth over the last two fiscal year -- growth between 15% and 20%. In quarter three of this fiscal year, growth was still 11%, April plus 10.8%, May plus 11.7%. **And then all of a sudden, June plus 0.8%, July minus 2.5%.**

So, you can easily picture the situation. We and the retailers -- we were planning some back-to-school season on the wings of high-double-digit growth. So, this was the way we were planning the Business. And all of a sudden, June and July, the market drop, and the growth drop to flat or even negative. And that explain [sic] the very, very quick and material readjustment of stock by the mass retailer to have inventory more tuned with growth that is different from the double digit.

\*\*\*

**Lauren Lieberman** - Barclays Capital – Analyst

I just wanted to talk a little bit about the destocking again, but really more granular. Just given commentary that we've heard earlier this year from Elizabeth Arden, I'm going to assume the bulk of the destocking you're seeing in North America has more been in fragrance so far, less so in color. So, one, is that correct?

Two, if you can talk a little bit about the lack of growth in OPI, and what sounds like a decline in Sally? Nail is still a super hot category. It seems like there are a lot of upstart brands out there. And with nail being 40% of the color business, just love to hear a little bit about that business, if you're seeing destocking or if you're just seeing a slowdown in the market or greater competition?

And then, finally, in Europe, just broad comments about promotional activity in Europe. What categories? Is it primarily skin and body -- so affecting adidas mostly? Or is it also in the facial color cosmetics -- so, Rimmel and -- well, really, primarily Rimmel and Manhattan? Thanks.

**Michele Scannavini** - Coty Inc. - CEO

Okay. So, let's start with the first one -- where we see more the impact of destocking. As I said in the script, we see it across categories. But the categories hit the most for us is nail. And then, this is explainable based on what I described before in terms of -- how sudden was the consumption drop? **Again, we are talking now of the market that till May was growing double digits, and then June and July was flat to negative.**

And we have, with Sally Hansen, more than one-third of share of the total nail market in the United States. So, when you have such a sudden market drop, and you are such a strong leader, obviously you are the one that pay the most in terms of destocking. So, what I expect to see -- I expect to see impact in the different categories where we operated from the destocking. **But we know that the biggest impact will be in nail, and particularly in Sally Hansen . . . .**

Now, in terms of the promotional activity in Europe, this is something that was very strong, particularly in South Europe -- that has been strong in the last few quarters because the market there is recessive. The market is declining in all the European countries, including France now. So, this promotional activity is across all the different products. We have seen now also that UK and Germany, the top, traditionally price-driven country, given the softer trend of the market, also are playing stronger in that arena.

Now, we have very strong position in Europe. And when there is strong fight to keep promotion with the trade space in the store, we need to fight. Now, clearly going forward, we will be very selective in identify [sic] the activity and the promotion that really can make the difference, because obviously we don't want to keep seeing, going forward, all the effort that we do to improve our cost of goods and to deliver savings with our supply chain offset by discount activity.

(alteration and emphasis added).

105.  On September 17, 2013, Coty shares declined from a closing price on September 16, 2013 of $16.25 per share, to as low as $14.99 during intraday trading on September 17, 2013 (a decline of approximately $1.26 per share or approximately 8%), before closing at $15.64 per share, a decline of $0.61 per share, or approximately 4%, on heavier than average volume.

106.  On November 7, 2013, before the market opened, Coty filed a report with the SEC on Form 8-K that contained a press release in which Coty announced its financial results for the fiscal quarter ended September 30, 2013.  The November 7, 2013 press release reported a "Decline

in Net Revenues Driven by U.S. Market Slowdown and Trade Destocking" and further stated, among other things, the following:

> Commenting on the Company's performance, Michele Scannavini, CEO of Coty Inc., said, "[i]n the first quarter we faced a significant market slowdown in the fragrance and nail categories, particularly in the U.S. This triggered heavy trade destocking and a slower order pace that meaningfully affected our U.S. mass market and overall business."
>
> ***
>
> **First Quarter Fiscal 2014 Summary Operating Review**
>
> ***
>
> **Color Cosmetics**
>
> **Net revenues declined in the Color Cosmetics segment in part due to significant destocking across key mass retailers in the U.S. following a demand slowdown especially in the Nail category.** This, together with increased competitiveness in the category, has particularly impacted Sally Hansen's performance. . . . **Adjusted operating income for Color Cosmetics decreased to $36.8 million from $73.2 million in the prior-year period, resulting in 11.8% adjusted operating income margin, a decline of 930 basis points compared to the prior-year period.**
>
> ***
>
> **Americas**
>
> The net revenues decrease in the region reflected a significant decline in the U.S., driven by weakness in the mass color cosmetics and fragrance markets, with particular pressure in the nail category.
>
> ***
>
> **Outlook for Fiscal 2014 Second Quarter and Full Year**
>
> The Company expects to see the challenges coming from the market slowdown and trade destocking in the U.S. and from the highly promotional environment in Europe to **continue in the next quarter.**
>
> (emphasis added).

107.    Also on November 7, 2013, the Company conducted a conference call with investors during which Defendants Scannavini and Pedreiro made the following statements:

[Defendant Scannavini:]

Lower consumption has generated a significant inventory reduction by the trade, particularly mass retailers, across all our product categories. **We estimate the destocking activity impacted our mass business in the quarter in the US by roughly $35 million.** In this context, our net revenues in the quarter declined 2.6% on a like-for-like basis. The decline was primarily due to the challenges we described in the US mass market. As a consequence, our business in the Americas declined 10% in the first quarter.

***

**In the Americas, our business was down 10% on a like-for-like basis. The decline was triggered by the US mass business, which was severely impacted by the concession slowdown and retailer destocking in the markets where we compete.**

***

After several quarters of growth ahead of market pace in the segments and geographies where we compete, **color was the segment which suffered the most from the mass market trade destocking in the US, and ended the quarter down 10%. Particularly affected were our nail business and the Sally Hansen brand, which holds one-third of the total nail mass market in the US. Impacting Sally Hansen performance was not only the sudden decline of market demand and the related sharp inventory reduction by trade, but also the escalated competitive environment with many new players competing in the nail arena with increasing investments.** Looking now at the short-term outlook, we expect to see challenges continuing in the course of Q2 as the turbulence in the US market is not over yet, **and we could see further destocking and cautious ordering until the segments where we compete start showing more encouraging trends.** Also, we have some unfavorable innovation phasing in comparison with Q2 versus the same period last year.

[Defendant Pedreiro:]

**Color continued to face a challenging business environment with significant destocking in the US, a slowdown in nail, and the increased competitive activity that drove higher discounting and allowances.** Revenues declined by $36 million, and we saw this impact flow through the P&L, resulting in a $37 million decline in the segment's adjusted operating income and in an adjusted operating margin that declined to 11.8% from 21.1% in the previous year.

(emphasis added).

108.    On November 8, 2013, Coty filed its quarterly report for the quarter ended September 30, 2013 with the SEC on Form 10-Q.  The November 8, 2013 10-Q stated, in part, the following:

**Color Cosmetics**

In the three months ended September 30, 2013, net revenues of Color Cosmetics decreased 10%, or $36.2, to $311.5 from $347.7 in the three months ended September 30, 2012 . . . The decline in the segment was primarily driven by lower net revenues of *Sally Hansen* and *OPI* in the U.S. **The decrease from *Sally Hansen* was in part due to several key U.S. mass retailers significantly reducing their inventory on hand in response to the sudden decline in consumer demand for nail products, resulting in lower replenishment orders in the three months ended September 30, 2013 compared to the three months ended September 30, 2012.** Net revenues for *Sally Hansen* were also negatively affected by an increasingly competitive retail environment. Also contributing to the decline in Sally Hansen were lower net revenues from Sally Hansen Salon Effects and Sally Hansen Magnetic Nail Color, which generated stronger net revenues in the three months ended September 30, 2012 as new launches, partially offset by higher net revenues from gel nail color category products in the three months ended September 30, 2013.

**The decline in *OPI* in the U.S. primarily reflects the discontinuation of a particular product line sold exclusively by a large retailer, and lower net revenues of products sold through the professional nail salon** chain . . . The negative price and mix impact for the segment was primarily driven by unit price declines in most key brands within the segment primarily driven by a promotionally competitive retail environment.

(emphasis added).

109.    On November 7-8, 2013, Coty shares declined from a closing price on November 6, 2013 of $15.40 per share, to close at $14.99 per share, a decline of $0.40 per share, or approximately 3%, on heavier than average volume.

110.    On November 18, 2013, Credit Suisse published an analyst report that stated, in part, the following:

**Double Headwind: Nail Trends Slow and Sephora Partnership Ends**

The nail care business, which has been a strong supporting actor in COTY's high constant-currency growth rates, has hit a snag. Category growth rates decelerated

to flat or slightly down in late 4Q13 [ended June 30, 2013] and early 1Q14 [ended September 30, 2013]. Commentary on the investor call on category trends were negative. **Additionally, Sephora's partnership to sell Sephora by OPI ended over the summer of 2013 and the OPI brand will no longer be sold in stores or online. Sephora is clearing its excess inventory with large sales on its e-commerce site, while stores have been completely transitioned to Sephora's new in-house label.** While OPI is considered a mass brand, being sold at Sephora as Sephora by OPI and as the de facto high-end house polish to Sephora's own brand lent the brand some prestige identity.

(alterations and emphasis added).

111.     On December 6, 2013, Coty filed a report with the SEC on Form 8-K in which, among other things, the Company disclosed that Defendant Pedreiro notified the Company's Board of Directors of the Company on December 3, 2013 of his decision to resign as Chief Financial Officer.

112.     On February 10, 2014, Credit Suisse issued a research report concerning Coty that stated, among other things, the following:

The weakness in nail care trends that management first called out in their 4Q13 results **has continued** according to Nielsen data, with the category down YoY -10.9% in the 12 weeks ended December 21, 2013. **In addition, the loss of Sephora distribution in the U.S. for the OPI brand could dampen growth in 2Q14.**

(emphasis added).

113.     On February 13, 2014, Plaintiff Stricker filed the initial action.  On February 13, 2014, Coty shares closed at $13.25 per share, a decline of $4.25 per share or approximately 24% from the IPO price of $17.50 per share.

114.     On February 14, 2014, before the market opened, Coty filed a report with the SEC on Form 8-K that contained a press release in which Coty announced its financial results for the fiscal quarter ended December 31, 2013.  The February 14, 2014 press release reported the following:

**Color Cosmetics**

· Net revenues declined in the Color Cosmetics segment primarily due to pressure in Sally Hansen as a result of the unfavorable comparisons, including the substantial new gel technology launch in the prior-year period, decreasing nail category demand in the U.S., and declining market share due to higher competitive activity. . . .

· Adjusted operating income for Color Cosmetics decreased to $33.7 million from $57.1 million in the prior-year period, resulting in 10.1% adjusted operating income margin, a decline of 540 basis points compared to the prior-year period.

***

**Americas**

· The net revenues decrease in the region was driven by the decline in the U.S., mainly due to nail.

115.   Also on February 14, 2014, Coty announced a $200 million share repurchase program.

116.   On February 14, 2014, Coty filed its quarterly report for the quarter ended December 31, 2013 with the SEC on Form 10-Q. The February 14, 2014 10-Q stated, in part, the following:

**Color Cosmetics**

In the six months ended December 31, 2013, net revenues of Color Cosmetics decreased 10%, or $71.0, to $645.7 from $716.7 in the six months ended December 31, 2012 . . . The decrease was primarily the result of a negative price and mix impact of 8% and a decline in unit volume of 2%. The decline in the segment was primarily driven by lower net revenues of *Sally Hansen* in the U.S. **The decrease from *Sally Hansen* was in part due to several key U.S. mass retailers significantly reducing their inventory on hand in response to the sudden decline in consumer demand for nail products, resulting in lower replenishment orders in the six months ended December 31, 2013 compared to the six months ended December 31, 2012.** Also contributing to the decline in *Sally Hansen* were lower net revenues from *Sally Hansen Insta Gel*, *Sally Hansen Salon Effects*, *Sally Hansen Complete Salon Manicure, Sally Hansen Salon Pro Gel*, and *Sally Hansen Magnetic Nail Color,* which generated stronger net revenues in the six months ended December 31, 2012 as new launches, partially offset by higher net revenues from new launch *Sally Hansen Triple Shine* in the six months ended December 31, 2013. Net revenues for *Sally Hansen* were also negatively affected by an increasingly competitive retail environment and weaker demand in the nail category in the U.S.

Lower net revenues from *OPI* also contributed to the decline in the Color Cosmetics

33

segment, reflecting a decline in the U.S. retail channel driven by the discontinuation of a particular product line sold exclusively by a large retailer and lower net revenues of *Nicole by OPI* . . . The negative price and mix impact for the segment was primarily driven by unit price declines in most key brands within the segment primarily driven by an increased level of highly promotional and discounted pricing activity, reflecting a competitive retail environment.

(emphasis added).

117.    On March 11, 2014, Defendant Scannavini made the following statements at a Bank

of America Merrill Lynch Consumer & Retail Conference:

The consumer today has anywhere between 9 to 18 product at home, so start with having maxed out a bit of their inventory at home. And this is reflected in the trend that we see of slowing down first of the growth and then a decline in the last month of the year. **This change of consumption has triggered a significant de-stocking activity from the trader. So what we have seen in the second semester was a trend of sales that was even worse than the decline of consumption because of the trade of stocking.**

***

**Olivia Tong** - BofA Merrill Lynch - Analyst

First, thank you again for joining us for what I believe is your first investor conference presentation, so appreciate that. Two questions. First, on North America, obviously been pretty difficult recently. So can you talk about some of the actions you are taking to mitigate the pressure and the potential for inventories de-stocking to continue? . . . .

**Michele Scannavini** - Coty Inc. - CEO
So let's start with the first one, on the situation in North America and the traders volumes and so forth.  So, as I was saying before, we have seen a pretty sudden slowdown of a concession in traffic over the last few months of the calendar year. And this has triggered, particularly in certain segments and particularly in the Mass channel, a significant [de]stock activity from the Mass retailer. . . .

The traders are adjusting the inventory based on consumption. So obviously, until the trend of consumptions are going to stabilize, there's going to be progressive readjustment of inventory. I believe that the big part of the readjustment is over, so happened between September or August-September and November-December. But still there is the need, I believe, from simple adjustment, given the results were not great in the beginning of the year.

(emphasis and alteration added).

118.    On March 28, 2014, Coty filed a report with the SEC on Form 8-K in which it disclosed that Darryl McCall, Executive Vice President, Global Operations and a member of the Company's Executive Committee, announced his retirement effective on December 31, 2014. According to the Company's annual report for the fiscal year ended June 30, 2013 filed with the SEC on Form 10-K on September 17, 2013, Mr. McCall "oversees Coty Inc.'s supply chain operations worldwide. Among his responsibilities, Mr. McCall ensures optimal service, maintains inventory levels and is responsible for cooperation between our operations and commercial functions."

119.    On May 14, 2014 Coty filed a report with the SEC on Form 8-K that contained a press release in which Coty announced its financial results for the fiscal quarter ended March 31, 2014 that stated the following:

**Color Cosmetics**

·  **Net revenues declined primarily due to pressure on Sally Hansen as a result of continued weakness in the U.S. nail category,** unfavorable comparisons versus the sizeable sell-in of the successful gel technology launch in the prior-year period, and market share decline in the U.S. . . .

·  Adjusted operating income for Color Cosmetics decreased to $36.7 million from $50.4 million in the prior-year period, resulting in 10.6% adjusted operating income margin, a decline of 310 basis points compared to the prior-year period.

\*\*\*

**Americas**

The net revenues decrease reflected the decline in the U.S., **driven by weakness in the mass color cosmetics and overall fragrance markets, with particular pressure in the nail category and Sally Hansen brand.**

(emphasis added).

120.    On May 14, 2014, Coty filed its quarterly report for the quarter ended March 31, 2014 with the SEC on Form 10-Q.  The May 14, 2014 10-Q stated, in part, the following:

Color Cosmetics

In the three months ended March 31, 2014, net revenues of Color Cosmetics decreased 6%, or $21.8, to $344.9 from $366.7 in the three months ended March 31, 2013 . . . The decrease was primarily the result of a reduction in unit volume of 5% and a negative price and mix impact of 1%. The decline in the segment was primarily driven by lower net revenues from nail products, in part reflecting continued declines since the first quarter of fiscal 2014 in the U.S. retail nail market. The Sally Hansen brand was the largest contributor to the segment decline in part due to lower net revenues from Sally Hansen Insta Gel and Sally Hansen Salon Effects nail products that generated stronger net revenues in the three months ended March 31, 2013. **Net revenues for Sally Hansen were also negatively affected by the aforementioned weaker demand in the nail category and decline in market share in the U.S.** Partially offsetting the decline within Sally Hansen were higher net revenues from new launches Sally Hansen Triple Shine and Sally Hansen I Heart Nail Art nail art pens.

Lower net revenues from OPI and N.Y.C. New York Color also contributed to the decline in the Color Cosmetics segment. **The decrease in OPI primarily reflects a decline in the U.S. retail channel driven by lower net revenues of Nicole by OPI and the discontinuation of a particular product line sold exclusively by a large retailer** . . . . The negative price and mix impact for the segment primarily reflects lower relative volumes of higher-priced gel nail products and an increased level of highly promotional and discounted pricing activity in the segment, reflecting a competitive retail environment.

(emphasis added).

121.    Also on May 14, 2014, during a conference call with investors, Defendant

Scannavini stated the following:

In the U.S., the market environment remains challenging, particularly in the mass channel. The fragrance market adjusting for the calendar effect was flat in prestige and declining in mass. The U.S. mass color market decelerated again in Q3, recording a 2% decline. **We saw even stronger decline in the nail category with 12% consumption decrease, compared to a 12% increase in Q3 of last year.** This represents a further deceleration, which was a mid-single digit decline in the first half. Lower consumption was driven by lower traffic in store, high inventory consumer houses and the contraction of the special effects nail category . . . **At this stage, we have no visibility on when the U.S. mass channel market will improve in color and particularly in nail.**

122.    On June 3, 2014, Coty disclosed an additional $200 million share repurchase

program.

123.    On September 29, 2014, Defendant Scannavini, notified the Company's Board of Directors of his decision to resign as Chief Executive Officer and a director, effective September 30, 2014.

## FIRST CLAIM FOR RELIEF
### Violation of Section 11 of the Securities Act against All Defendants

124.    Plaintiffs repeat and reallege each and every allegation contained above.

125.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against all Defendants.

126.    As set forth above, the Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

127.    Coty is the issuer of common stock in the IPO.  As issuer of the shares, Coty is strictly liable to Plaintiffs and to the members of the Class who purchased pursuant and/or traceable to the Registration Statement for the materially untrue statements and omissions alleged herein.

128.    The Individual Defendants were directors at the time of the IPO and/or signed the Registration Statement or authorized it to be signed on their behalf.

129.    Under Section 11 and the SEC's rules and regulations, the Individual Defendants owed to the purchasers of Coty the duty to make a reasonable investigation of the statements contained in the Registration Statement to ensure that such statements were accurate and that they did not contain any misstatement or omission of material fact, and in the exercise of reasonable care, should have known that the Registration Statement contained misstatements and omissions of material fact.

130.    By reasons of the conduct herein alleged, the Registration Statement contained material misstatements and material omissions, and therefore the Coty violated Section 11 of the

Securities Act, and the Individual Defendants breached their duties to Plaintiffs and members of the proposed class.

131.    On February 13, 2014, the day this action was filed, Coty shares closed at $13.25 per share, a decline of $4.25 per share, or approximately 24%, from the IPO price of $17.50 per share.

132.    As a result of the purchase or acquisition of Coty stock pursuant and/or traceable to the Registration Statement, Plaintiffs and member of the proposed Class have sustained damages.

## SECOND CLAIM FOR RELIEF
### Violation of Section 15 of the Securities Act against the Individual Defendants

133.    Plaintiffs repeat and reallege each and every allegation contained above.

134.    This Count is brought pursuant to Section 15 of the Securities Act against the Individual Defendants.

135.    The Individual Defendants were each a control person of Coty by virtue of his position as a director and/or senior officer of Coty.

136.    As control persons of Coty, the Individual Defendants are liable jointly and severally with and to the same extent as Coty for its violation of Sections 11 of the Securities Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; awarding reasonable costs, including attorneys' fees; and such equitable/injunctive relief as the Court may deem proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: New York, New York
       October 18, 2014

KAPLAN FOX & KILSHEIMER LLP

By:  /s/  Jeffrey P. Campisi
Jeffrey P. Campisi
850 Third Avenue
New York, NY  10022
Telephone: (212) 687-1980
Facsimile:  (212) 687-7714

THE ROSEN LAW FIRM, P.A.
Phillip Kim
Jonathan Stern
Laurence Rosen
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827

*Co-Lead Counsel for Lead Plaintiffs*