UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

No. 14-cv-919 (RJS)
_____

IN RE COTY INC. SECURITIES LITIGATION

_____

OPINION AND ORDER
March 29, 2016
_____

RICHARD J. SULLIVAN, District Judge:

Lead Plaintiffs Eugene Stricker and Michael Bollinger, on behalf of themselves and all other persons and entities who purchased Coty Inc. ("Coty") common stock in connection with its initial public offering ("IPO") (collectively, "Plaintiffs"), bring this securities action against Coty and some of its officers and directors (the "Individual Defendants," and collectively, "Defendants") for issuing an allegedly false and misleading registration statement in violation of Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"). Now before the Court is Defendants' motion to dismiss the Amended Consolidated Class Action Complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, Defendants' motion is granted.

I. BACKGROUND

A. Facts[1]

Founded in Paris in 1904, Coty manufactures beauty products, including fragrances, color cosmetics, and skin care products, which it sells in over 130 countries and territories around the globe, primarily through mass market retailers such as CVS,

---

[1] The following facts are taken from the Amended Consolidated Class Action Complaint, filed on October 18, 2014. (Doc. No. 50 ("Complaint" or "Compl.").) In ruling on Defendants' motion, the Court has also considered Defendants' Memorandum of Law (Doc. No. 46 ("Mem.")), Defendants' Supplemental Memorandum of Law (Doc. No. 51 ("Supp. Mem.")), Plaintiffs' Opposition (Doc. No. 53 ("Opp'n")), and Defendants' Reply (Doc. No. 55 ("Reply")). When deciding a motion to dismiss, the Court may also consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

Kmart, Target, Walgreens, and Walmart. (Compl. ¶ 34; Doc. No. 45, Ex. 2 (the "Registration Statement"), at 1; Compl. ¶ 36 (citing Registration Statement at 113).) In 2001, Coty began to implement a "new strategic vision to transform the Company through product-offering diversification and a new global-branding strategy." (Registration Statement at 102.) Between 2002 and 2012, Coty more than tripled its net revenues, achieving revenues of $4.6 billion in the 2012 fiscal year. (*Id.*) Seventy percent of Coty's net revenue in 2012 came from its ten "power brands," including color cosmetic and nail products OPI and Sally Hansen. (Compl. ¶¶ 37–39; Registration Statement at 1–2.)

In the spring of 2013, Coty announced its plans to go public with an IPO, and, on May 28, 2013, Coty filed its Registration Statement with the Securities and Exchange Commission ("SEC"). (Compl. ¶ 1.) The Registration Statement, which became effective on June 12, 2013 (Doc. No. 45, Ex. 3 ("Notice of Effectiveness"), at 2), spanned nearly 200 pages and contained detailed reports of Coty's financial condition for the first three quarters of the 2013 fiscal year, based in part on the performance of its power brands, and listed the various risks facing Coty at the time. Among other things, the Registration Statement noted that Coty's year-over-year net revenues and operating income for the first three quarters of the 2013 fiscal year had increased 4%. (*Id.* at 51, 55.) It further stated that this increase was primarily driven by growth in Coty's power brands Sally Hansen and OPI and its global expansion of the OPI product line. (*Id.* at 52, 106.) Nevertheless, in a section discussing the risks that Coty might face in the future, the Registration Statement warned investors that Coty's performance could be affected by increased competition, market trends, and excess inventory. (*Id.* at 20–21, 33.) On June 13, 2013, Coty commenced its IPO, in which it sold approximately $1 billion in common stock. (Compl. ¶ 1.) On the same day, Coty also filed its Prospectus with the SEC. (Doc. No. 45, Ex. 4 (the "Prospectus").)

Three months later, on September 17, 2013, Coty filed a Form 8-K with the SEC and issued a press release announcing Coty's financial results for the fourth quarter and the 2013 fiscal year that ended on June 30, 2013. (Compl. ¶ 101.) The press release indicated that "[o]ver the last few months the Company has seen a deceleration of market growth in the U.S. and Europe, triggering significant trade de-stocking activity, particularly by U.S. mass retailers." (*Id.* (citation omitted).)[2] On the same day, Coty conducted a conference call with analysts and investors to discuss its financial results. (*Id.* ¶ 102.) During the call, Defendant Michele Scannavini, then-CEO of Coty, noted that "[t]he nail category has seen unprecedented competitive activity" and that "[i]nventory reduction in the US mass markets" would likely lead to "marginally lower" net revenues in the first quarter of the 2014 fiscal year as compared to the previous year. (*Id.*) Scannavini also stated that there had been de-stocking of Sally Hansen products in the fourth quarter of the 2013 fiscal year and first quarter of the 2014 fiscal year. (*Id.*; *see also id.* ¶ 104 (noting that the "biggest impact" from destocking "will be in nail, and particularly in Sally Hansen").) As a result, Scannavini noted that the nail category, which had "fantastic growth over the last two fiscal year[s]," experienced a decline in growth, especially in June 2013, when there was only 0.8% growth, and July, when there was 2.5% decline in growth. (*Id.* ¶ 104.) This

---

[2] According to the Complaint, "[d]estocking occurs when retailers adjust their inventory levels by declining to purchase new inventory, and instead, sell the inventory at issue at a discount." (Compl. ¶ 3.)

2

drop caused a "very, very quick and material readjustment of stock by mass retailer[s] to have inventory more tuned with growth." (*Id.*) Nevertheless, Scannavini noted that, even though the situation appeared "gloom[y]," he expected that "the boost of the activity in [the] emerging market[s]" would "bring our growth rate much more in line with our long-term targets." (Doc. No. 45, Ex. 5 ("Sept. 17, 2013 Earnings Call Tr."), at 10.)

On November 7, 2013, Coty announced its results for the first quarter of the 2014 fiscal year. *See* Coty Inc., Quarterly Report (Form 10-Q) (Nov. 7, 2013) ("First Quarter SEC Report"). In the first quarter of fiscal year 2014, Coty's net revenues decreased 3% as compared to the 2013 first quarter, and net revenues of the color cosmetics products decreased 10% as compared to the 2013 first quarter. *Id.* at 23–24. The decline in color cosmetics was "primarily driven by lower net revenues of *Sally Hansen* and *OPI* in the U.S." *Id.* at 24. In particular, revenues of Sally Hansen in the United States decreased as a result of "an increasingly competitive retail environment" and a decline in consumer demand for nail products, which ultimately caused retailers to reduce their inventory of Sally Hansen products. *Id.* In addition, the decline in sales of OPI in the United States was attributed, in part, to the discontinuation of the "Sephora by OPI" nail polish line. *Id.* Nevertheless, as Scannavini predicted in the September 17, 2013 fourth quarter and year-end earnings call, "accelerated growth in emerging markets," such as Brazil, Chile, and Argentina, "partially offset[]" the decline in net revenues in North America. *Id.* at 25.

B. Procedural History

On February 13, 2014, Plaintiffs filed the first complaint in this action, asserting Section 11 violations against all Defendants, a Section 12 violation against underwriter Merrill Lynch, and Section 15 violations against the Individual Defendants.[3] (Doc. No. 2.) In essence, Plaintiffs allege that Coty's Registration Statement painted an overly sunny picture of Coty's financial health and deliberately obscured the dark clouds that had begun forming well before the IPO in June as a result of increased competition, destocking by U.S. mass market retailers, and the termination of the partnership between Coty and one of its important vendors, Sephora. Relying primarily on an assortment of confidential informants[4] within the company, Plaintiffs allege that:

- A confidential informant ("CI 1"), who worked as a Vice President of Field Sales for Coty from June 2009 through February 2013 and was an account manager for color cosmetics products, stated that "starting in late 2012, sales of Coty's Color Cosmetics were struggling due to increased

---

[3] The Individual Defendants include Michele Scannavini, Sérgio Pedreiro, James E. Shiah, Lambertus J.H. Becht, Bradley M. Bloom, Joachim Faber, Oliver Goudet, Peer Harf, M. Steven Langman, Erhard Schoewel, Robert Singer, and Jack Stahl. (Compl. ¶¶ 13–25.) On September 10, 2014, Plaintiffs voluntarily dismissed the Section 12 claim against Merrill Lynch. (Doc. No. 43.)

[4] "It is well-established that confidential sources may be relied upon in a complaint so long as plaintiffs also rely on other facts that provide an adequate basis for believing the allegations in the complaint," such as by providing the position of the confidential source "to support the probability that a person in the position occupied by the source would possess the information alleged." *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 767 n.23 (S.D.N.Y. 2012) (internal quotation marks and alteration omitted) (citing *Novak v. Kasaks*, 216 F.3d 300, 313–14 (2d Cir. 2000)).

competition and lack of customer demand for Coty's products." (Compl. ¶¶ 40, 60.)

- A second confidential informant ("CI 2"), who served as Director of Demand Planning, Supply Chain, and Sales and Operations Planning, "was responsible for managing the supply chain unit," and worked at Coty from December 1999 through October 2013, noted that, by January or February of 2013, sales of the newly launched Sally Hansen nail gels "were forecasted to be down." (*Id.* ¶¶ 41, 65.) CI 2 also noted that, in May or June of 2013, he "observed de-stocking activity whereby Coty's cosmetics were being returned or destroyed." (*Id.* ¶ 66.)

- A third confidential informant ("CI 3"), who served as a Senior Marketing Manager in the Brand Management Division of Coty from January 2007 through October 2013, worked within the color cosmetics department for mass market retailers like Walmart and Walgreens, and "was partially responsible for . . . observing the effects of competitor products" on Coty's sales, noted that "towards the end of 2012 through 2013, there was a significant increase in competitor products, which negatively affected consumer demand for *Sally Hansen* products." (*Id.* ¶¶ 42, 60.)

- Another confidential informant ("CI 4"), who worked as a Demand Analyst from January 2013 through April 2013 and attended bi-weekly meetings at which customers' orders and Coty's forecasts on products such as Sally Hansen were discussed, noted that "customer orders for *Sally Hansen* products were smaller than expected" during the period of CI 4's employment. (*Id.* ¶¶ 43, 62.)

- Another confidential informant ("CI 6"), who worked as a retail manager at Coty from 2007 to December 2013, generally stated that, in the spring of 2013, there was a "slow-down in mass market sales of certain cosmetic products." (*Id.* ¶¶ 45, 63.)[5]

- Finally, a confidential informant ("CI 7"), who worked as a corporate travel consultant "for OPI Products/Coty Inc. from February 2012 through April 2013" and "was responsible for arranging business travel itineraries for OPI's senior executives" stated that, in November 2012, he learned from the Supervisor of the Corporate Travel Department at OPI that "OPI was no longer going to be manufacturing or marketing the *Sephora by OPI* line of nail products." (*Id.* ¶¶ 46, 73.)

Based on these facts, Plaintiffs claim that the Registration Statement contained false and misleading statements in violation of Section 11 and that Defendants failed to disclose negative material trends that were allegedly affecting Coty at the time of the IPO in violation of Item 303 of Regulation S-K.[6]

On September 23, 2014, Defendants filed a motion to dismiss the complaint for failure to state a claim under Sections 11 and 15 of the Securities Act. (Doc. No. 44.) On October 18, 2014, with permission from the

---

[5] While a fifth confidential informant ("CI 5") is identified in the Complaint (Compl. ¶ 44), Plaintiffs attribute no allegations to CI 5.

[6] Plaintiffs' Complaint does not allege that the Prospectus contained any false statements in violation of the Securities Act.

4

Court, Plaintiffs amended their complaint by adding additional factual allegations, mostly from confidential informants. (Doc. Nos. 49, 50.) After the Amended Consolidated Class Action Complaint was filed, the Court allowed Defendants to supplement their memorandum of law in support of their motion to dismiss. (Doc. No. 51.) The motion was fully briefed on December 2, 2014. (Doc. Nos. 53, 55.)

## II. LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must "provide the grounds upon which [the] claim rests." *ATSI Commc'ns, Inc.*, 493 F.3d at 98; *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."). To meet this standard, plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns*, 493 F.3d at 98. However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Id*. at 570.

In addition, because Plaintiffs' Section 11 and Section 15 claims are not based on fraud and neither party suggests as much (*see* Mem. at 8–9; Opp'n 10–11), Plaintiffs need not satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) or the Private Securities Litigation Reform Act. *See Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012).

## III. DISCUSSION

### A. Section 11

Section 11 of the Securities Act gives "purchasers a right of action against an issuer or designated individuals (directors, partners, underwriters, and so forth) for material misstatements or omissions in registration statements." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund et al.*, 135 S. Ct. 1318, 1323 (2015); *see also In re Francesca's Holdings Corp. Sec. Litig.*, Nos. 13-cv-6882, 13-cv-7804 (RJS), 2015 WL 1600464, at *23 (S.D.N.Y. Mar. 31, 2015) (noting that Section 11 imposes liability on "every person who signed the registration statement, the directors of the issuer, and the underwriters of the security" when the registration statement contains "a material misstatement or omission" (internal quotation marks omitted)). Accordingly, to state a claim for a Section 11 violation, a purchaser of the security must allege that a registration statement, at the time it became effective, "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a); *see also Ladmen Partners, Inc. v. Globalstar, Inc.*, No. 07-cv-976 (LAP), 2008 WL 4449280, at *10 (S.D.N.Y. Sept. 30, 2008). Unlike Section 10(b) of the Securities Exchange Act of 1934, Section 11 does not require that

a plaintiff demonstrate that the defendants acted "with any intent to deceive or defraud" to establish liability. *Omnicare*, 135 S. Ct. at 1323. As a result, Section 11 essentially imposes "strict liability on issuers and signatories" for making false or misleading statements in registration statements. *Panther Partners*, 681 F.3d at 120; *Degulis v. LXR Biotech., Inc.*, No. 95-cv-4204 (RWS), 1997 WL 20832, at *3 (S.D.N.Y. Jan. 21, 1997) ("[T]o make out a *prima facie* case at the pleadings stage, Plaintiffs need only allege a material misstatement or omission. Neither knowledge nor reason to know is an element in a plaintiff's prima facie case."); *see also Herman & MacLean v. Huddleston*, 459 U.S. 375, 381–82 (1983) ("[S]ection [11] was designed to assure compliance with the disclosure provisions of the [Securities] Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." (footnote omitted)).

To decide whether a misstatement or omission is material, a court "must engage in a fact-specific inquiry" as to whether "there is a substantial likelihood that a reasonable shareholder would consider it important" in making an investment decision. *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (internal quotation marks omitted). Moreover, the "central issue" for a Section 11 claim is "not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor about the" securities. *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990); *see also ECA, Local 134 IBEW Joint Pension Trust of Chi.*, 553 F.3d at 197 ("[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." (citation omitted)).

Under Section 11, a defendant can also be liable for "an omission in contravention of an affirmative legal disclosure obligation." *Panther Partners*, 681 F.3d at 120. Regulation S-K outlines the reporting requirements for SEC filings of public companies, and Item 303 of Regulation S-K requires an issuer of securities to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). Therefore, a defendant may be liable under Item 303 if it failed to disclose a trend that "is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716 (2d Cir. 2011) (quoting SEC Release No. 6835, 54 Fed. Reg. 22427, 22429 (May 18, 1989), 1989 WL 1092885 ("SEC Release 6835"), at *4). "Knowledge of a trend is an essential element triggering disclosure under Item 303." *In re Noah Educ. Holdings, Ltd. Sec. Litig.*, No. 08-cv-9203 (RJS), 2010 WL 1372709, at *6 (S.D.N.Y. Mar. 31, 2010); *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 614 (S.D.N.Y. 2008) (noting that merely "pleading a trend's *existence*" is insufficient to establish knowledge), *aff'd*, 347 F. App'x 665 (2d Cir. 2009). To demonstrate knowledge, a plaintiff must allege facts that raise a "plausible inference" that the company's management was aware of a trend that would "materially impact" the company's financial condition. *Panther Partners*, 681 F.3d at 121–22.

6

Here, Plaintiffs assert Section 11 and Item 303 claims based on the allegations that the Registration Statement contained material misstatements or omissions regarding (i) the financial performance of Coty's color cosmetics products, (ii) the destocking of Sally Hansen and OPI products by retailers, (iii) the global expansion of OPI and the termination of the "Sephora by OPI" brand, and (iv) the market risks facing Coty at the time of the IPO. The Court addresses each argument in turn.

1. Sales of Coty's Color Cosmetics

Plaintiffs first argue that the Registration Statement was misleading when it stated that the net revenues and operating income of Coty's color cosmetics products had increased in the nine months ending on March 31, 2013 as compared to the same months in the previous fiscal year. According to Plaintiffs, this statement, even if "technically accurate" (Opp'n at 22), was misleading because (i) net revenues and operating income of Coty's color cosmetics "were materially declining" by June 13, 2013 (Compl. ¶¶ 78(a), 80–81, 84–85) and (ii) increased competition was leading to a material decline in Coty's color cosmetics products, including its Sally Hansen line (*id.* ¶¶ 67–68, 74, 78(b)).

Plaintiffs do not assert that the Registration Statement's assertions that the net revenues and operating income of Coty's color cosmetics "increased" were false. Instead, Plaintiffs seem to argue that the Registration Statement's assertion about Coty's past financial performance – as of March 31, 2013 – was misleading because it created an implicit promise that Coty's net revenues and operating income would continue to increase, even though, as Plaintiffs allege, sales of color cosmetics were declining at the time of the IPO. However, Plaintiffs' assertion has no basis in securities law. Indeed, as several courts within the Second Circuit have stated, "disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future." *In re Duane Reade Inc. Sec. Litig.*, No. 02-cv-6478 (NRB), 2003 WL 22801416, at *6 (S.D.N.Y. Nov. 25, 2003) (internal quotation marks omitted), *aff'd sub nom.*, *Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250 (2d Cir. 2004); *see also, e.g.*, *In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 395 (S.D.N.Y. 2006) ("Defendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy." (internal quotation marks omitted)); *In re Bayer AG Sec. Litig.*, No. 03-cv-1546 (WHP), 2004 WL 2190357, at *11 (S.D.N.Y. Sept. 30, 2004) (finding that accurate statements of "strong sales" records are not actionable "since they are merely recitations of historical fact and are not alleged to be inaccurate"). As a result, Plaintiffs have failed to allege that the truthful facts set forth in the Registration Statement claim about Coty's year-over-year net revenues and operating income as of March 31, 2013 were misleading.

Moreover, Plaintiffs allege no facts that actually support their assertions that sales of Coty's color cosmetics were declining at the time of the IPO. Instead, Plaintiffs rely on a series of conclusory, nonspecific statements from confidential informants who claim that, starting in late 2012, sales of color cosmetics were "struggling," "underperform[ing]," "forecasted to be down," and "smaller than expected" due to a "significant increase" in competitor products. (Compl. ¶¶ 60, 62–65, 67.) Such generic allegations fail to raise a plausible inference that the Registration Statement omitted a fact, much less a *material* fact, that required disclosure under either Section 11 or Item 303. *See In re*

7

*IAC/InterActiveCorp Sec. Litig.*, 695 F. Supp. 2d 109, 119 (S.D.N.Y. 2010) (noting that allegations by confidential informants that are "stated in the most general of terms and without any facts that might corroborate the statements of unidentified former employees" are insufficient to state a plausible claim); *In re IndyMac Mortg.-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 510 (S.D.N.Y. 2010) (statement of one confidential witness that defendants' appraisals were "shoddy" insufficient to sustain, by itself, a Section 11 claim); *Schoenhaut v. Am. Sensors, Inc.*, 986 F. Supp. 785, 791 (S.D.N.Y. 1997) (noting that the phrase "continued strong demand" does not "convey any material information" because it "does not contain information of reasonable specificity or impart a definite indicia of performance; rather, it constitutes nothing more than a vague assertion").

In an effort to bolster these vague allegations from confidential informants, Plaintiffs make much of the fact that the quarterly operating income of Coty's color cosmetic segment decreased from $57.1 million on December 31, 2012 to $50.4 million on March 31, 2013 to $28.1 million on June 30, 2013. (Compl. ¶ 78(e)(i).) However, these numbers offer little guidance as to the information that was available at the time of the IPO. Indeed, Plaintiff's own allegations in the Complaint reflect that revenue in the nail category of Coty's color cosmetics products had growth of 10.8% in April, 11.7% in May, and then, "all of a sudden," just 0.8% in June, suggesting that the decline in growth rate of sales Coty's color cosmetics began in June, just as the Registration Statement became effective on June 12, 2013. (Compl. ¶ 104 (citing Sept. 17, 2013 Earnings Call Tr. at 10).) But, as Plaintiffs themselves have already conceded (*see* Opp'n at 23), Defendants were not required to disclose a drop in sales that began in June, merely two weeks before the Registration Statement became effective. *See In re Focus Media Holding Ltd. Litig.*, 701 F. Supp. 2d 534, 540 (S.D.N.Y. 2010) ("The case law [in Section 11 cases] reflects that courts have been reluctant to impose liability based upon a failure to disclose financial data for a fiscal quarter in progress." (internal quotation marks omitted)); *In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001) ("[T]he SEC and the case law recognizes how unworkable and potentially misleading a system of instantaneous disclosure out [of] the normal reporting periods would be," especially since an "immediate release of data" would likely be "without the benefit of reflection or certainty provided by the traditionally recognized reporting periods."). In short, even if sales of Coty's color cosmetics were declining before the Registration Statement became effective on June 12, 2013, which is by no means clear from the Complaint, Plaintiffs have alleged no facts demonstrating that the Registration Statement was false or misleading merely because it stated that net revenues in the first three quarters of the 2013 fiscal year – as of March 31, 2013 – had increased over the same time period in the previous fiscal year. *See also Charter Twp. of Clinton Police & Fire Ret. Sys. v. KKR Fin. Holdings LLC*, No. 08-cv-7062 (PAC), 2010 WL 4642554, at *11 (S.D.N.Y. Nov. 17, 2010) ("[P]laintiffs are not allowed to plead Section 11 claims with the benefit of 20/20 hindsight.").

Nor have Plaintiffs pleaded facts that could support an Item 303 claim for failure to disclose known trends regarding Coty's declining sales. First, Plaintiffs' allegations fail to demonstrate that the decline in growth rate occurred sufficiently in advance of the Registration Statement that it required disclosure as a negative material trend under Item 303, since the alleged decline in Coty's

8

nail products began, at the earliest, in June. As noted above, according to the facts alleged in the Complaint, revenue growth in Coty's nail products actually increased 10.8% in April and 11.7% in May, only to slow down "all of a sudden" to 0.8% in June. (Compl. ¶ 104 (citing Sept. 17, 2013 Earnings Call Tr. at 10).) Assuming the truth of these facts, the decline in growth rate would have been almost contemporaneous with the IPO on June 13, 2013 – clearly an insufficient time period to establish a trend, as opposed to an "isolated occurrence[]" that would not require disclosure under Item 303. *See In re Noah*, 2010 WL 1372709, at *6; *Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*, No. 07-cv-10528 (RWS), 2010 WL 148617, at *10 (S.D.N.Y. Jan. 14, 2010) ("As a matter of law, a two[-]month period of time does not establish a 'trend' for purposes of the disclosures required by Item 303."); *Pearlstein v. BlackBerry Ltd.*, No. 13-cv-7060 (TPG), 2015 WL 1137519, at *10 (S.D.N.Y. Mar. 13, 2015) (finding that two- and five-month periods are insufficient to establish a trend); *see also In re Noah*, 2010 WL 1372709, at *6 ("Plaintiff's own characterization of the changes in raw-material costs as a 'spike' belies allegations that [defendant] was experiencing a trend of rising costs in raw materials before the IPO." (citation omitted)).

Second, even assuming that there was such a trend, Plaintiffs' Item 303 claim would still fail because Plaintiffs have not plausibly alleged that Coty's management had knowledge of this trend at the time the Registration Statement became effective. To support their claim that this trend was "presently known to management," Plaintiffs allege that the "negative trends were discussed within the Company at senior levels." (Compl. ¶ 68.) However, such a conclusory assertion is insufficient to raise a plausible inference of knowledge. *See Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 230 (S.D.N.Y. 1999) (finding that plaintiffs must allege specific knowledge of a particular trend). In addition, Plaintiffs' assertion that, through certain technological platforms, "Coty management" monitored the "amount of inventory held by retailers in a near real-time fashion" to forecast sales trends (*id.* ¶¶ 47–50) fails to raise a plausible inference that any particular member of Coty management had knowledge of any particular decline in sales. *See Blackmoss*, 2010 WL 148617, at *9 (noting that a plaintiff alleging an Item 303 violation must plead "with some specificity" facts establishing that the defendant had knowledge of the purported trend). Similarly, Plaintiffs' additional allegation that Coty employed "'demand planners' who were responsible for sales forecasts" and "conduct[ed] monthly forecast consensus meetings with Marketing and Operations teams" (Compl. ¶¶ 51–57) does not identify any specific trend that Coty's management was "alert[ed]" to – after May, in which growth from nail products increased by nearly 12%, but before the Registration Statement became effective on June 12, 2013 – as a result of these meetings. *See Johnson v. Sequans Commc'ns S.A.*, No. 11-cv-6341 (PAC), 2013 WL 214297, at *12 (S.D.N.Y. Jan. 17, 2013) (granting dismissal of an Item 303 claim where "there is no allegation that [management] ever received information alerting it to" the alleged negative material trend). Finally, CI 3's allegation that he attended monthly meetings, along with the President of Coty Beauty Americas, where "declining sales trends, customer disinterest, and competitor risks were discussed" (Compl. ¶ 69), is so vague as to which of Coty's products were facing declining sales or how "customer disinterest" or "competitor risks" affected any particular

9

color cosmetic product as to be meaningless. In short, Plaintiffs' Item 303 analysis boils down to an assertion that fourth quarter revenues were down and management had meetings about the company's performance so, therefore, management must have known of the bad numbers before the IPO.

But Item 303 simply requires more to demonstrate a plausible inference of knowledge by management. For example, in *McKenna v. SMART Technologies Inc.*, the court held that allegations "detail[ing] the employees' roles," explaining "why those employees would have access to the information discussed in the" complaint, and identifying "internal reports and information about decreased demand," which contained "the information contrary to the picture of increasing demand portrayed in the Offering Documents" were sufficient to raise a plausible inference of knowledge. No. 11-cv-7673 (KBF), 2012 WL 3589655, at *5 (S.D.N.Y. Aug. 21, 2012). Similarly, in *Panther Partners*, the Second Circuit held that plaintiffs' allegations that the defendant was receiving numerous calls about a defective product and was gathering its board of directors to discuss this issue and fly to Japan to address the defect with the manufacturers raised a plausible inference of knowledge. 681 F.3d at 121–22. No similar allegations exist here. Instead, Plaintiffs merely allege that there were meetings and describe only in broad, conclusory terms what was discussed at those meetings. (Compl. ¶ 69 (noting that "declining sales trends, customer disinterest, and competitor risks were discussed").) As a result, Plaintiffs' allegations are "[s]ketchy at best" and "do not provide enough detail to nudge plaintiffs' claims across the line from conceivable to plausible." *In re IAC/InterActiveCorp*, 695 F. Supp. 2d at 119.

Accordingly, the Court finds that Plaintiffs have failed to raise a plausible inference that Coty's financial performance as of March 31, 2013, as stated in the Registration Statement, constituted material misstatements or omissions in violation of Section 11 or Item 303.

2. Destocking

Plaintiffs also allege that the Registration Statement – which noted that the year-over-year increase in net revenue of Coty's color cosmetics products in the first three quarters of the 2013 fiscal year was "primarily driven by strong growth in . . . *Sally Hansen*" – was misleading because, at the time of the IPO, Sally Hansen products were being destocked. (Compl. ¶¶ 78(e), 82–83 (quoting Registration Statement at 51).) Plaintiffs further allege that the Registration Statement's assertion that growth in the color cosmetics business was "driven by the growth of higher than segment average priced . . . *OPI* products" was misleading because OPI products were similarly being destocked "by the time of the IPO." (*Id.* ¶ 83.)

Once again, however, these alleged misstatements are statements of historical fact, which are not even alleged to be false and could be deemed misleading only if construed to be an implicit promise of continued growth of comparable magnitude or, in other words, an assurance of future performance. But Section 11 does not recognize such a theory of liability, or require corporations to downplay or derogate their accurate historical results. *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 358 F. Supp. 2d 189, 210 (S.D.N.Y. 2004) ("The disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future."). Therefore,

10

Plaintiffs' Section 11 claim with respect to destocking is denied.

Plaintiffs nevertheless assert that Defendants had an obligation to disclose the fact of destocking because such activity constituted a trend under Item 303. This claim fails as well. While Plaintiffs conclusorily allege that Coty's products were being destocked in the "months leading up to the IPO" (Compl. ¶ 58), the only fact alleged in support of this assertion is the single allegation from CI 2 that, "[i]n approximately May/June 2013, CI 2 observed de-stocking activity whereby Coty's cosmetics were being returned or destroyed" (*id.* ¶ 66). However, such a vague and equivocal allegation about "de-stocking activity" cannot support a plausible inference that, at the time the Registration Statement became effective on June 12, 2013, Coty's products were being destocked in such a *material* way as to require disclosure with respect to a $4.6 billion company. *See In re IAC/InterActiveCorp*, 695 F. Supp. 2d at 120–21 (granting dismissal of a Section 11 claim where plaintiffs' confidential informants "have offered no concrete facts that would demonstrate – or even hint, really" – at the existence of a fact that would make the registration statement misleading).

Similarly, Plaintiffs' reliance on statements made by Scannavini in the September 17, 2013 earnings call – nearly *three months after the IPO* – that destocking had "impacted Sally Hansen in the fourth quarter of fiscal-year '13 and the first quarter of fiscal-year '14" (Compl. ¶ 102) is misplaced since Plaintiffs fail to explain *when* such destocking began or *when* the material effects of that destocking became known to management. Moreover, as previously noted, post-IPO financial results cannot be used to support Plaintiffs' Section 11 claim. *See Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) ("Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud."). Thus, the Court finds that an August 8, 2013 analyst report discussing "Coty's *potential* exposure to destocking" (Compl. ¶ 99 (emphasis added)) and Coty's November 7, 2013 press release, which stated that a decline in net revenues was caused, in part, by destocking (*id.* ¶ 106), likewise fail to raise a plausible inference that Coty was experiencing destocking issues, and that management knew so, before June 2013 such that Defendants were required to disclose this fact at the time the Registration Statement became effective. *See In re TVIX Sec. Litig.*, 25 F. Supp. 3d 444, 450 (S.D.N.Y.) (noting that a Section 11 claim cannot be based on "hindsight" or a "backward-looking assessment of the registration statement" (internal quotation marks omitted)), *aff'd sub nom.*, *Elite Aviation LLC v. Credit Suisse AG*, 588 F. App'x 37 (2d Cir. 2014); *In re Noah*, 2010 WL 1372709, at *6–7 (finding that a spike in raw materials lasting two months was insufficient to establish a trend).

In sum, Plaintiffs' one-two punch of poor post-IPO earnings coupled with temporally nonspecific and substantively vague assertions of destocking by one confidential informant is not enough to establish the falsity of the Registration Statement or the existence of an omitted known trend. Accordingly, the Court dismisses Plaintiffs' Section 11 and Item 303 claims as they relate to destocking.

3. Expansion of OPI and the Termination of the "Sephora by OPI" Partnership

Plaintiffs next allege that Coty's Registration Statement – which stated that "we are expanding the *OPI* brand globally" and that the increase in net revenue was

caused by a growth in sales of OPI products in the nine months leading up to March 31, 2013 (Compl. ¶¶ 80, 88–89 (quoting Registration Statement at 51, 106)) – was misleading because, at the time of the IPO, the "OPI sales had contracted in material part because a partnership between Coty and Sephora for the sale of Coty's *Sephora by OPI* nail polish" in the United States had ended (*id.* ¶¶ 78(c), 89–90, 112).

Once again, Plaintiffs do not allege that the historical statements contained in the Registration Statement were false. Instead, they effectively argue that the statements were misleading because they amounted to an implicit promise of ongoing growth. But as noted above, Plaintiffs cannot base a Section 11 claim on implicit promises read into Defendants' historical factual statements. Moreover, even assuming that Section 11 countenanced such a fanciful theory of liability, Plaintiffs still fail to explain how the termination of a single product line sold in the United States demonstrates that Defendants' statements that the OPI brand was expanding *globally* was false or misleading. Put simply, Plaintiffs have offered no allegation about how the termination of the U.S.-based "Sephora by OPI" nail polish impacted the *global expansion* of OPI offerings. Significantly, Plaintiffs do not allege that Coty's annual report filed with the SEC on September 17, 2013 – which acknowledged that "*OPI* net revenues were in line with fiscal 2012," while nevertheless also noting that, in the 2013 fiscal year, OPI indeed expanded globally and Coty achieved "higher net revenues from the *expanded distribution* [of OPI] in Europe" – was false or misleading. Coty Inc., Annual Report (Form 10-K) (Sept. 17, 2013) ("Coty 2013 Annual Report"), at 39 (emphasis added). The 2013 Annual Report also stated that, "[i]n nail care, we achieved a #1 position *globally* in the combined retail and professional channels driven by *Sally Hansen* and *OPI*." (Declaration of Lisa H. Rubin, dated Sept. 23, 2014, Doc. No. 45, Ex. 6 (emphasis added).) In short, Plaintiffs have alleged no facts to demonstrate that the Registration Statement's assertion that OPI was expanding globally was false or misleading in violation of Section 11.

In addition, Plaintiffs have failed to demonstrate how the termination of a single product line – the "Sephora by OPI" nail polish brand – constituted a *material trend* that required disclosure under Item 303. While "the likely non-renewal of a material contract" may in certain circumstances constitute a trend that should be disclosed, *see* SEC Release 6835 at *4, a plaintiff must still raise a plausible inference that the termination of the contract "materially impact[ed]" a company's financial condition. *Panther Partners*, 681 F.3d at 121–22. For example, in *Litwin v. Blackstone Group., L.P.*, the Second Circuit found that a defendant private equity firm's loss of its exclusive contract with its biggest customer constituted a trend that the firm was required to disclose if it was determined that the termination of the contract was "reasonably expected to materially impact [the defendant's] future revenues." 634 F.3d 706, 719 (2d Cir. 2011); *see also Panther Partners*, 681 F.3d at 121 (finding that defendant was required to disclose, as a negative material trend under Item 303, that a product defect affected its customers which accounted for 72% of its revenues).

Here, beyond conclusorily alleging that the partnership between Coty and Sephora for the sale of the "Sephora by OPI" nail polish was a "material partnership" (Compl. ¶ 78(c)), Plaintiffs have failed to allege any facts about the significance of this line to Coty's broader business or that the termination of this product line materially affected Coty's financial condition prior to

12

June 12, 2013. Indeed, as already discussed, Plaintiffs' assertion that the termination of the sale of the "Sephora by OPI" line materially decreased OPI's sales (Compl. ¶ 89) is belied by the fact that Coty's 2013 Annual Report, which Plaintiffs do not dispute, demonstrated that OPI's net revenues in the 2013 fiscal year "were in line with fiscal 2012," despite the decline in U.S. sales occasioned by the termination of the Sephora by OPI line, due to the expanded global distribution of OPI products. (Coty 2013 Annual Report at 39.) As a result, even if Plaintiffs plausibly alleged that Coty terminated the "Sephora by OPI" relationship before June 12, 2013, the Court would nevertheless grant Defendants' motion to dismiss Plaintiffs' Item 303 claim in light of Plaintiffs' failure to allege *any* facts demonstrating that the termination of the "Sephora by OPI" product line materially impacted Coty's financial condition.

Finally, Plaintiffs' Section 11 and Item 303 claims must fail for the additional reason that Plaintiffs have failed to allege a plausible inference that the termination of the "Sephora by OPI" product line occurred before the IPO on June 13, 2013. To support their claim that this partnership ended prior to June 13, 2013, Plaintiffs rely on allegations from a single confidential informant, CI 7, who worked as a corporate travel consultant "for OPI Products/Coty Inc. from February 2012 through April 2013" and "was responsible for arranging business travel itineraries for OPI's senior executives." (Compl. ¶ 46.) CI 7 stated that, in November 2012, he learned from the Supervisor of the OPI Corporate Travel Department that "OPI was no longer going to be manufacturing or marketing the *Sephora by OPI* line of nail products" and that, around the same time, he attended a "warehouse sale at which huge amounts of *Sephora by OPI* product were severely discounted to OPI employees." (*Id.* ¶ 73.) As an initial matter, the Court finds that this second-hand statement by CI 7 – a corporate travel consultant who was not an executive or manager, or even an employee in a relevant area of Coty's business – is insufficient on its own to raise a plausible inference that the "Sephora by OPI" partnership ended in November 2012, much less that Coty's management was aware of this "trend." *See McKenna*, 2012 WL 3589655, at *5 (noting that a confidential informant's "general allegations and anecdotes of former employees," absent "plausible detail as to why individuals" in those positions would have knowledge of those allegations, is insufficient to state a Section 11 claim (alteration and internal quotation marks omitted)). Moreover, other allegations in the Complaint suggest that the termination of the "Sephora by OPI" line did not occur until after the IPO. For example, Plaintiffs provide an excerpt of a November 2013 Credit Suisse analyst report which stated that "Sephora's partnership to sell Sephora by OPI ended *over the summer of 2013*." (Compl. ¶¶ 110, 112 (emphasis added).) Similarly, the Complaint references a February 2014 report which stated that "the loss of Sephora distribution in the U.S. for the OPI brand could dampen growth in 2Q14" – which was, of course, eight months *after* the IPO. (*Id.* ¶ 112.)

Accordingly, because Plaintiffs have failed to allege a plausible inference that the termination of the "Sephora by OPI" brand in the United States rendered a statement about OPI's *global expansion* misleading or that the termination would have a material impact on Coty's financial performance, the Court grants Defendants' motion to dismiss the Section 11 and Item 303 claims.

13

4. Risk Disclosures

Finally, Plaintiffs allege that the risk disclosures in Coty's Registration Statement were false or misleading, in violation of Section 11, because they stated that certain events *could* affect Coty when, at the time of the IPO, they *were already affecting* Coty. More specifically, Plaintiffs contend that the Registration Statement's assertions that increased competition within the highly competitive beauty business, rapid changes in market trends and consumer preferences, and the possibility of retaining excess inventory could impact Coty's future financial performance (Registration Statement at 20–21, 33) were misleading because, at the time of the IPO, sales of Coty's color cosmetics products were already declining as a result of increased competition, the destocking of Sally Hansen and OPI products had already occurred, and the termination of the "Sephora by OPI" nail polish line had already been effectuated (Compl. ¶¶ 91–98).

"Courts in this Circuit have held that a company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized." *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("The Company's purported risk warnings misleadingly represented that this revenue cut was merely possible when, in fact, it had already materialized."); *see also Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."). However, as the Court has already found, Plaintiffs have failed to allege facts to establish that any of these alleged events were occurring at the time of the IPO, and the fact that some of these events occurred *after* the Registration Statement became effective is simply not enough to state a Section 11 claim. *See In re ProShares Trust Sec. Litig.*, 889 F. Supp. 2d 644, 653 (S.D.N.Y. 2012) ("When a registration statement warns of the exact risk that later materialized, a Section 11 claim will not lie as a matter of law."), *aff'd*, 728 F.3d 96 (2d Cir. 2013).

Moreover, even if it could be demonstrated that some of these events had occurred prior to June 12, 2013, Coty's highly vague and generic discussion of potential market risks "could not have been misleading to a reasonable investor as the description said nothing company-specific, and no reasonable investor would infer anything about the state of" the company. *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 362 (S.D.N.Y. 2008) (internal quotation marks omitted); (*see, e.g.*, Registration Statement at 20–21 (noting that Coty's financial performance could suffer if it is unable to "compete effectively" or does not continuously develop new products)); *see also In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 579 (S.D.N.Y. 2013) ("[W]here there is disclosure that is broad enough to cover a specific risk, the disclosure is not misleading simply because it fails to discuss the specific risk." (citing *Hunt v. All. N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 730–31 (2d Cir.1998))), *aff'd*, 566 F. App'x 93 (2d Cir. 2014).

As a result, because Plaintiffs have not plausibly alleged that these risk disclosures discussed events that were already occurring at the time of the IPO or were otherwise misleading, the Court grants Defendants' motion to dismiss these claims.

B. Section 15

Section 15 of the Securities Act imposes derivative and joint and several liability on individuals who "control[] any person

liable" under Section 11, "unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." 15 U.S.C. § 77o(a). Obviously, failure to plead a Section 11 claims necessarily leads to the dismissal of a Section 15 claim. *See Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 490 (2d Cir. 2011). Therefore, because the Court has determined that Plaintiffs have failed to allege a primary violation under Section 11, the Court grants Defendants' motion to dismiss Plaintiffs' Section 15 claim.

### C. Leave to Amend

Although "Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend 'shall be freely given when justice so requires,' it is within the sound discretion of the [Court] to grant or deny leave to amend." *McCarty v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (quoting Fed. R. Civ. P. 15(a)). In addition, the Second Circuit has consistently stated that district courts may deny leave to amend when plaintiffs request such leave in a cursory sentence on the last page of an opposition to a motion to dismiss, without any justification or an accompanying suggested amended pleading. *See, e.g.*, *Food Holdings Ltd. v. Bank of Am. Corp.*, 423 F. App'x 73, 76 (2d Cir. 2011) (affirming district court's denial of leave to amend where plaintiff requested leave to amend "on the final page of their brief in opposition to defendants' motion to dismiss, in boilerplate language and without any explanation as to why leave to amend was warranted"); *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 188 (2d Cir. 2014) (affirming denial of leave to amend where plaintiffs already had one opportunity to amend their complaint and they "identified no additional facts or legal theories" to support their request to amend); *Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 275–76 (2d Cir. 2006).

Here, on the final page of their opposition to Defendants' motion to dismiss, Plaintiffs, without any legal or other support, state in a single sentence that "[i]n the event of dismissal, [they] request leave to replead." (Opp'n at 25.) Significantly, Plaintiffs offer no basis for their request for leave to amend nor do they attach a proposed amended complaint. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (noting that a court may deny leave to amend, on notice grounds, "where the request gives no clue as to how the complaint's defects would be cured" (internal quotation marks omitted)). Notably, this is not Plaintiffs' first attempt at re-pleading in this action. To the contrary, on October 17, 2014, after Defendants filed their first motion to dismiss, Plaintiffs sought and received leave to amend "in order to address purported pleading deficiencies identified by Defendants" in their motion to dismiss. (Doc. Nos. 47, 49.) Among the deficiencies identified by Defendants was the failure to allege "concrete facts" supporting their claims. (Doc. No. 47.) Notwithstanding the opportunity to file amended pleadings, Plaintiffs' claims still rely on general and conclusory allegations from a handful of confidential witnesses who fail to provide sufficient facts capable of sustaining a cause of action.

As Judge Lynch aptly noted when he was on the district court, "[w]hile pleading is not a game of skill in which one misstep may be decisive to the outcome, neither is it an interactive game in which plaintiffs file a complaint, and then bat it back and forth with the Court over a rhetorical net until a viable complaint emerges." *In re Refco*

*Capital Mkts., Ltd. Brokerage Customer Sec. Litig.*, Nos. 06-cv-643, 07-cv-8686, 07-cv-8688 (GEL), 2008 WL 4962985, at *2 (S.D.N.Y. Nov. 20, 2008) (citations and internal quotation marks omitted); *see also Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (noting that courts can deny leave to amend where there has been "repeated failure to cure deficiencies by amendments previously allowed"); *NRW, Inc. v. Bindra*, No. 12-cv-8555 (RJS), 2015 WL 3763852, at *1 (S.D.N.Y. June 16, 2015) ("To grant leave to amend after a plaintiff has had ample opportunity to amend would be condoning a strategy whereby plaintiffs hedge their bets . . . in the hopes of having another bite at the proverbial apple." (internal quotation marks omitted)). Accordingly, because Plaintiffs have failed to provide any basis or explanation as to why an additional opportunity to amend would cure the Complaint's deficiencies, and because Plaintiffs' past attempts provide no comfort in this regard, the Court denies Plaintiffs' request for leave to amend.

## IV. CONCLUSION

Plaintiffs' Complaint, as written, constitutes a classic example of Monday morning-quarterbacking whereby Plaintiffs, armed with disappointing fourth quarter results, resort to vague assertions and innuendo to support a "Defendants misled me" theory of liability. Unfortunately for Plaintiffs, Section 11 requires much more than the grab bag of suspicion and speculation contained in Plaintiffs' pleading. Accordingly, IT IS HEREBY ORDERED THAT Defendants' motion to dismiss the Amended Consolidated Class Action Complaint is GRANTED in its entirety. The Clerk of the Court is respectfully directed to terminate the motion located at docket number 44 and close this case.

SO ORDERED.

_____
RICHARD J. SULLIVAN
United States District Judge

Dated: March 29, 2016
New York, New York

\* \* \*

Lead Plaintiff Eugene Stricker is represented by Jeffrey Philip Campisi of Kaplan Fox & Kilsheimer LLP, 850 Third Avenue, 14th Floor, New York, New York 10022.

Lead Plaintiff Michael Bollinger is represented by Phillip C. Kim and Jonathan Stern of The Rosen Law Firm P.A., 275 Madison Avenue, 34th floor, New York, New York 10016; and Jeffrey Philip Campisi of Kaplan Fox & Kilsheimer LLP, 850 Third Avenue, 14th Floor, New York, New York 10022.

Defendants Coty Inc. and the Individual Defendants are represented by Mark Adam Kirsch, Christopher Joralemon, and Lisa Heather Rubin of Gibson, Dunn & Crutcher, LLP, 200 Park Avenue, 48th Floor, New York, New York 10166.

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3-29-16